**STATE OF MINNESOTA ex rel. GEORGE J. FLINT v. ELLEN FLINT.[1]**

December 13, 1895.

Nos. 9593—(117).

### Custody of Child—Right of Father.

While the statute [2] provides that the father, if a suitable person, shall have the custody of the person and the care of the education of his minor child, yet this is not an absolute legal right, beyond the control of the courts.

### Same—Welfare of Child.

The primary object of the courts in such matters is to secure the welfare of the child, and not the special claims of either parent; and the cardinal principle is to regard the benefit of the infant the paramount consideration.

### Same—Judicial Discretion.

In this case the parents had separated, and were living apart, without any prospect of reconciliation. The child was only four years old, and the mother had had the care of it since its birth. She was admitted to be a perfectly competent person to have its care and custody. The father had no female inmate of his family, except a daughter by a former marriage, aged only 14 years. His engagements required his absence from his home during the day, and frequently in the evening. *Held* that, without regard to which party was most to blame for the separation, there was no error in the trial court, in the exercise of its judicial discretion, committing, for the time being, the custody of the person of the child to the mother, subject to the right of the father, at seasonable intervals, to visit it, and take it out for walks or drives.

Appeal by relator from an order of the district court for Ramsey county, Otis, J., discharging a writ of habeas corpus and ordering that the custody of a minor child remain in respondent until further order, subject to the conditions stated in the opinion. Affirmed.

*E. M. Card*, for relator.

*C. D. & Thos. D. O'Brien*, for respondent.

MITCHELL, J. The relator and the respondent are husband and wife, but have separated, and the former sued out a writ of habeas corpus to obtain the custody of their minor child. The parents were married in 1889, but their married life has been anything but a happy one. Disagreements between them commenced within a few

[1] Reported in 65 N. W. 272.          [2] G. S. 1894, § 4540.

months after their marriage, but gradually grew more and more serious, and finally culminated in the respondent's leaving her husband, taking with her their child, aged between three and four years, and going to live with her married sister and her brother-in-law. While the parties lived together, their disagreements had become so serious as to result in the relator's occupying a room separate from that of his wife, and forbidding her to speak to him or to communicate with him except by letter or through a third party.

One of the sources of disagreement, although not the only one, was their difference of views as to the religious training and education of the child. The respondent belonged to the Catholic church, and desired to have her child baptized and brought up in that church. The relator, who is not an adherent of any church or other religious denomination, was opposed to having his children taught any form of religious faith, or what he terms "dogma," until they were old enough to choose for themselves, and then he did not care what church they joined. When the respondent expressed a desire to have her child baptized in the Catholic church, he positively forbade it, and told her that, if she had the child baptized, "all will be over with you and me." The most serious charge made against her is that, notwithstanding this prohibition, the respondent had the child baptized without the knowledge of her husband. But, as this fact was not known to him until she testified to it on the hearing, it could not have influenced his conduct towards his wife prior to their separation.

The relator, who apparently has a very exalted idea of his prerogatives as father, seems to have acted upon the theory, advanced by his counsel on the argument, that, as "head of the family," he is in law vested with the absolute and sole custody, control, and education of his child, to the exclusion of the mother, who has no voice or privileges in the matter except such as he, in his discretion, may see fit to grant to her; and it is apparent from his own testimony that, in suing out this writ, he is actuated quite as much by a desire to vindicate these supposed legal rights as by his regard for the welfare of the child. The respective merits or demerits of any particular form of religious faith is not a matter of judicial cognizance. Neither is the ultimate and paramount question which of these parties is to blame, or most to blame, for their disagreement and sep-

aration. We may remark, however, that the evidence would justify the conclusion that the relator was, at least, quite as much in fault as the respondent. But it was a condition, and not a theory, which confronted the court. The parties had separated, and there seemed to be no probability of their uniting again; and, as suggested by the trial judge, it was evident from the relator's own testimony that, if the respondent had attempted to return, she would have received so cold a welcome, without either promise or indication of any change of treatment on his part, that it could hardly be said that she was under any legal or moral obligation to return and again become a member of her husband's household.

The question that confronted the court was to whom, under this condition of things, to intrust the custody of the child. The paramount question was not who was most to blame, but what would be most for the benefit of the infant. At the time of the hearing, the child was hardly four years old,—an age at which it required the care of a mother. The mother had had the almost exclusive charge of it from its birth. It was conceded that she was a perfectly competent person to have the custody of it, and that she always had taken good care of it. Her sister and brother-in-law, with whom she was making her home, were admitted to be highly respectable people. So far as appears, the mother was financially at least as able to support the child as was the father, who appeared to be in very straitened circumstances. He had no female inmate of his family, except a daughter by a former marriage, who was only 14 years old. His engagements, business or otherwise, seemed to have compelled his absence from home during the day as well as much of the evening.

Now, while, under our statutes, the father is given the right to the custody of his minor children, yet this right is not an absolute legal right, beyond the control of the courts. The cardinal principle in such matters is to regard the benefit of the infant paramount to the claims of either parent. While the courts will not lightly interfere with what may be termed the "natural rights" of parents, yet the primary object of all courts, at least in America, is to secure the welfare of the child, and not the special claims of one or the other parent. Under the facts of this case, we cannot see that the trial court at all abused its judicial discretion in giving the custody of

this infant to its mother, subject to the conditions, however, that she should not remove it from the city, and that the father should have the right to visit it at seasonable hours three times a week, and to take it to his home or for a walk or drive for five hours every Sunday. Of course, all such orders are merely provisional and temporary, and may be changed at any time when conditions change.

Order affirmed.

The following supplemental opinion was filed December 24, 1895:

PER CURIAM. Since the opinion in this cause was filed, the relator has petitioned this court to modify the order of the lower court as to the times and places at which he shall have the privilege of seeing, or visiting, his child. This is a matter which must be addressed to the court below. Our jurisdiction in the matter is only appellate, and we ought not to reverse or modify the action of the trial court except for error appearing from the record.

Petition denied.