## STATE EX REL. WILLIAM F. MACHGAN v. JOHN PELOWSKI AND ANOTHER.[1]

### April 30, 1920.

### No. 21,439.

**Custody of child by parent.**

1. A father's right to the care and custody of his child is superior to that of any other person, and he should not be deprived of that right unless the best interests of the child so require.

**Balancing of advantages to child.**

2. In determining whether the father or the child's maternal grandparents shall have the custody of the child in controversy, the court will consider the advantages likely to inure to the child from an agreement between the child's parents and grandparents, that the latter should rear and educate her and make the same provisions in their will for her as for their own children, but such agreement, while executory, is not controlling upon the question of custody.

**Custody awarded to father.**

3. The father in this case is *held* a proper person to have the care and custody of his child, and the welfare of the child best served by awarding her custody and care to him.

Upon the relation of William F. Machgan the district court for Le Sueur county granted its writ of habeas corpus directed to John Pelowski and Veronica Pelowski commanding them to release his child, Ethel Machgan, and surrender her to relator. The matter was heard by Tifft, J., who awarded the custody of the child to relator. From that order, John Pelowski and Veronica Pelowski appealed. Affirmed.

*Charles C. Kolars, F. C. & H. A. Irwin* and *Moonan & Moonan,* for appellants.

*Herbert P. Keller,* for respondent.

[1]Reported in 177 N. W. 627.

Holt, J.

By habeas corpus William F. Machgan seeks to obtain the custody of his daughter Ethel from John and Veronica Pelowski, the parents of Ethel's deceased mother. The father prevailed in the district court, and the grandparents appealed to this court. The trial here is de novo. Upon the testimony taken and reported by the referee herein the following facts appear:

In October, 1913, Machgan, then about 22 years old, married Anna Pelowski, who was three years younger. He was born and brought up in St. Paul, his parents being German Lutherans. Anna was born and raised on a farm in Le Sueur county, her parents being Polanders of the Catholic faith. To secure their consent to the marriage Machgan became a Catholic. The young couple first boarded for a month or two with the husband's relatives in St. Paul, and then went to housekeeping in rented rooms. Machgan had very little with which to establish a household, and received some help from Anna's parents. He was an operator in a shoe factory, and had been such for some time. In October, 1914, Ethel was born. A year later a strike in the factory caused Machgan to despair of earning a living for his family in the city. The Pelowskis were appealed to, and they received Machgan with his wife and child into their home. In the spring of 1916, Machgan secured temporary quarters in neighboring unoccupied farm houses, and did whatever work he could find to do among the farmers, but it is clear that the Pelowskis continued to give substantial aid to Machgan's family as long as Anna lived. In the fall of 1916, Anna appears to have contracted a serious illness, which during the following winter increased so that it became necessary for the Pelowskis to again take her and the child into their own home for proper care. Here they remained until the summer of 1917, when, at the attending physician's suggestion, Machgan rented a place in Montgomery, where it would be more convenient to give Anna the medical attention she needed. The Pelowskis also let their daughter Emily accompany Machgan to Montgomery. Emily nursed Anna and attended to the housework until Anna's death. While living in Montgomery Anna gave birth to a second child. A few weeks thereafter she was taken to a hospital in St. Paul for an opera-

tion. While she was at the hospital the infant died and was buried. Within a couple of weeks she was returned to Montgomery, where in a few days she died. Anna's hospital expenses were paid by Machgan's mother. The funeral expenses of Anna and the baby were paid by Pelowski, as were also one-half of the medical services rendered by the physician at Montgomery.

Since her mother's death Ethel has been with the Pelowskis, except for visits of some weeks' duration with her father's relatives in St. Paul. Some time after his wife's death, Machgan returned to St. Paul and got work in a shoe factory and in May, 1918, secured a position in the city fire department, where he still remains at a salary of $105 per month. At present he boards with a widowed sister. He has no property or resources except his earnings. He has discharged some of the bills incurred during his wife's illness. The Pelowskis own the 154-acre farm where they reside, valued at $225 per acre. They also have live stock and other personal property estimated at $11,500. They owe $3,000. Mr. Pelowski is 58 and his wife 44 years of age. They have eight children living at home, the eldest, Emily, being 22 and the youngest two years old. Two grown brothers of Mr. Pelowski also share the home. The one is deaf and dumb, and the other is so seriously afflicted with hydrocephalus that he must be cared for like an infant.

In addition to the above uncontroverted facts we consider it established that shortly before Anna's death she requested her parents to rear and educate Ethel, and they agreed to so do and also to will her a share in their estate equal to that of any of their own children, and that Machgan consented to this arrangement.

This bitter contest for the custody of this child has mainly taken the form of an effort on the part of Machgan to show the unfitness of the conditions of the Pelowski home and the discreditable traits or habits of the two dominating persons therein, Mrs. Pelowski and Emily. A like assault is made upon the habits and character of Machgan by appellants. It is quite certain that neither Mrs. Pelowski nor Mr. Machgan has, as a rule, refused to indulge in intoxicating liquors when such could be had. But we think the charges made against both are greatly exaggerated. And under the present status of intoxicants no

particular fear need be apprehended that intemperance will at all inter-
fere with the proper discharge of the domestic duties that may devolve
upon either of the persons mentioned. Nor do we think the conditions
pertaining to the bodily comforts of those who occupy the farm home
are such as to cause apprehension that Ethel might not there develop
into a healthy and vigorous woman. Neither should there be misgivings
as to proper moral training, even though there is written evidence that
culture and refinement at times of provocation entirely desert some
members of the family. Anna came from that home, and Machgan, his
mother, sisters and relatives with one accord sound her praise as a woman
of rare ability and exceptionally sweet disposition and high character.

The right of a father to the custody of his motherless child is supe-
rior to that of any other person. He should not be deprived of that
right, unless it is made to appear that the best interests of the child
demand it. State v. Martin, 95 Minn. 121, 103 N. W. 888; State v.
Halvorson, 127 Minn. 387, 149 N. W. 664.

It is urged that the agreement made at Anna's death-bed is one which
courts may enforce, if the one in whose behalf it is made complies with
the conditions. This is true, but such agreements are not binding on
courts, when the question of the care and custody of a child is to be
determined. State v. Anderson, 89 Minn. 198, 94 N. W. 681. How-
ever, we should not be unmindful of the pecuniary advantage that may
inure to Ethel by the agreement that by will she should be assured of
her share of the Pelowski inheritance.

Notwithstanding the property consideration just alluded to, and
notwithstanding the fact that Ethel's father has no home of his own
to which he can take her, we nevertheless have reached the conclusion
that her best interests will be served by awarding her custody and care
to him, and mainly for these considerations: Machgan's plan is to
make a home for himself and child with his brother-in-law and sister,
Mr. and Mrs. Hawkins, who are very much attached to Ethel. Mr. and
Mrs. Hawkins own, free of debt, a modern, comfortable home in a good
residential district of St. Paul. They have been married 11 years, but
no children have been born to them. Mr. Hawkins taught school for
five years, but for a number of years has been in the railway mail serv-
ice. His present salary is $150 per month. The evidence is undis-

puted that both Mr. and Mrs. Hawkins are persons of high character, entirely capable of properly caring for Ethel. It is very likely that Ethel will here find a permanent home, with care, comforts and advantages, educational and otherwise, which she could not obtain were she to remain with her grandparents. Mrs. Pelowski has more than any woman ought to be called to attend to, in caring for her eight children and her husband's two unfortunate brothers. One who has for years cared for a being so sadly afflicted as this one brother-in-law of hers deserves unstinted praise, and no doubt Mrs. Pelowski has done more for him that any one else. But although she has so far uncomplainingly attempted to do her duty by every member of this large family, we think her already heavy burden should not be needlessly increased. It is suggested that death may invade the Hawkins home, and then Machgan would have no suitable place for Ethel. But Mrs. Pelowski and Emily, the ones who might be expected to care for Ethel in the Pelowski home, are not immune from that visitor. Furthermore, Machgan's mother, who owns the house in which she lives and is able to work, testified that she would gladly give Ethel a home. Her testimony rings so refreshingly straightforward and true that we have no doubt of either her desire or ability to care for Ethel as she should be cared for, if it ever became necessary for her father to take her from the home where he now intends to place her.

In reaching the conclusion that the best interests of Ethel will be promoted by giving her to the custody of her father, we do not believe any pecuniary loss will result to her from the fact that she may not be in a position to enforce the agreement her mother made for her with the Pelowskis. The agreement only insured to Ethel that part which would come to her through her mother in case Pelowski died intestate. We do not believe that the affection and love which both Mr. and Mrs. Pelowski profess for Ethel, and which is evidenced by what they have done for her and her parents and the great expense they have gone to in seeking to retain her custody, will permit them to disinherit Ethel because of her father's successful effort to obtain possession of her.

Much is made by counsel for the Pelowskis of some testimony of cruel treatment of his wife by Machgan. The kindly treatment accorded Machgan by the whole Pelowski family, and the friendly visits that

continued after Anna's death between her relatives and Machgan's up to the time this proceeding started, seem to us to wholly discredit the charge that Anna had been abused or cruelly treated by her husband. Again, Machgan's statement in his questionnaire, by which he obtained a deferred classification in the selective draft, is severely and we think justly criticised. But with all that, we think Machgan must be held to be a proper person to have the custody of his daughter and that her welfare will be better served by being with him than with her grandparents. We deem a more extended statement or discussion of the evidence unnecessary.

Upon the consideration hereinbefore indicated the custody and control of Ethel Machgan is hereby awarded to the relator, her father. No statutory costs are allowed.

Let judgment be entered accordingly.