IN RE GUARDIANSHIP OF MICHAEL WAYNE MALONEY,
LAWRENCE WILLIAM MALONEY, AND GERALD
ARTHUR MALONEY.
STATE EX REL. REGINA MALONEY AUSDEMORE AND
ANOTHER v. CATHOLIC WELFARE ASSOCIATION
AND ANOTHER.
HERMAN J. HOOKOM, SR., AND ANOTHER v. CATHOLIC
WELFARE ASSOCIATION.[1]

June 19, 1951.

Nos. 35,288, 35,320, 35,354.

---

*Henry G. Young* and *Nathan Rivkin,* for appellants.
*Sykora & Gustafson,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

The opinion of this court filed April 13, 1951, is hereby withdrawn, and this opinion is substituted in its place.

Case No. 35,320 is an appeal from two orders of the district court, one dated December 17, 1949, denying a motion to have a guardianship dismissed and certain minor children returned to their natural mother, and the other dated February 6, 1950, denying a motion to vacate a previous order of the court dated February 28, 1949, which declared the minors to be dependent children and committed them to the guardianship of the Catholic Welfare Association. The order of February 6, 1950, also denied a motion to amend the court's order of December 17, 1949, or to reopen the hearing in order to permit further testimony. Case No. 35,288 is a certiorari proceeding. Case No. 35,354 is an appeal from an order of the district court quashing a writ of habeas corpus. Both

cases arose out of the same general fact situation as case No. 35,320 and were heard at the same time as the latter case under an order of this court.

The facts as they appear in the record are substantially as follows:

Regina Maloney, mother of the minors involved, and Wayne John Maloney were married in Minneapolis July 14, 1940. Michael, the oldest child, was born October 21, 1941, Lawrence on January 30, 1943, and Gerald on June 13, 1944. Apparently the father did not provide sufficient funds for the support of the family, and the marriage was not a success. The record further shows that neither parent showed much interest in providing for the welfare of the children, who were badly neglected at times. As early as June 1946, complaints were made to the Hennepin County Welfare Board by neighbors that the children were being neglected. The police were called on three different occasions during that general period to give aid to the children. In August 1947, the parents applied to a social agency for financial aid, as the husband was not working at that time. In November of that year the mother obtained work in a Minneapolis cafe. Part of the time she worked days and part of the time nights. The record shows that between August 28 and sometime in November 1947 Mrs. Maloney consulted the family and children's service in the family division of the community fund and asked for help in connection with her marriage, which was not going well. She also discussed financial difficulties and the possibility of the family's eviction. Her husband also consulted this service at least twice during that time. They were referred to the city relief department. In the meantime, the family and children's service attempted to offer some help in connection with their marriage problems. Conditions apparently went from bad to worse so far as the marriage was concerned, and on August 24, 1948, Mrs. Maloney again called at the family division office, ruled out any further help so far as saving the marriage was concerned, said that she was getting a divorce, and that she wanted placement for the children. Two days later her husband also called

to discuss this unhappy situation. Inasmuch as Mrs. Maloney wanted permanent placement for the children, she was referred to the Hennepin County Welfare Board, hereinafter called the welfare board.

On or about September 17, 1948, the husband reported to the family division that papers had been served upon him in connection with divorce proceedings brought by his wife on the previous day and that his wife had left him and the children. Mrs. Maloney claimed that she had been informed that she and her husband could not get a divorce so long as they lived in the same house, and that since he refused to move out she did. In any event, it appears that the children were placed with the welfare board about October 20, 1948, which in turn placed them temporarily with the Catholic Welfare Association, referred to hereinafter as the CWA, where they would receive board, room, and care. After the divorce proceedings were commenced in September 1948, Mr. and Mrs. Maloney entered into a stipulation, dated November 23, 1948, giving custody of the children to their father. This stipulation also gave him the right to make plans for the care of the children, including the right to place them under the supervision of the welfare board. It further provided that the mother would pay $5 a week to the welfare board toward the support of the children and that she would furnish some clothing. Mrs. Maloney was granted a divorce from her husband on February 23, 1949. The court in that action refused to follow the stipulation of November 23, 1948, "except as found in the findings," and granted custody of the children to the mother, with the privilege and right "to place the children under the care and supervision of the Hennepin County Welfare Board." The court also ordered the father to pay the mother as support money for the children "a total of $15.00 per week, and such clothing as are suitable to properly clothe the children." The court further ordered that the payments were to be made to the welfare board should the mother place the children in the custody of the board. The day after the divorce was granted, the welfare board

petitioned the court for guardianship of the children, alleging that they were dependent.

On February 28, 1949, the juvenile division of the district court made its findings and order adjudging and determining the minors to be dependent and committing them to the general guardianship of the CWA, the parents having previously consented to this guardianship arrangement. Thereafter and on April 18, 1949, Herman J. Hookom, the maternal grandfather of the children, visited the CWA and talked with its executive director with the evident intent of trying to secure custody of the children. After telling him what the proceedings had been up to that time and that the parents had given consent or had asked the court to transfer guardianship to the CWA, the director told Hookom that he was interested in seeing what could be done about the matter. He told the grandfather that he could not promise anything in connection with the two younger children, because they were up for placement or on the border line of being placed, but that he would have one of the social workers go out and check Hookom's home to see what could be done about a summer placement for Michael, the eldest child.

The record shows that Mrs. Maloney was married on June 20, 1949, to one Francis Ausdemore. In the meantime, the CWA director again saw Hookom on May 11, 1949, and informed him that as a result of the home study they were not satisfied as to the suitability of any future plan. Ausdemore testified that if his wife regained custody of her children he was willing to support them, and he claimed to be earning $240 to $250 a month as a carpenter.

The matter before us in connection with the appeal from the order of December 17, 1949, arose out of an order to show cause and notice of motion made by the mother and her father to have the guardianship proceedings dismissed and have the children returned to their natural mother. In its memorandum made in connection with the order denying that motion, the court stated that it had been shown at the hearing that the welfare board had accepted the children for a period of approximately four months and

had expended close to $800 before a permanent plan was made; that the CWA had expended approximately $1,300 for the care and support of the children from the time it had received the guardianship until the time the matter was heard by the court on December 8, 1949; that the mother knew in June 1949 that the CWA did not intend to give up the children voluntarily, but that she did not press this hearing until nearly five months afterward. However, the court commented, the grandfather had volunteered to reimburse the CWA in the sum of $500 because of the delay in having the proceedings heard, and therefore that the matter of laches had been eliminated so far as its decision was concerned. The court seemed more concerned that the matter be decided from the standpoint of the welfare of the children rather than from the equities between the CWA, the mother, and the grandfather in regard to any sums expended. The court further said that the facts were conclusive that the natural parents understood thoroughly that the proceedings in connection with the guardianship meant the giving up of their children; that they were told that they might petition the court for a return of the children, but that this probably was remote. The court further said:

"* * * There is no doubt in this court's mind but what on the day of the hearing both parents were desirous of having these children adopted out, and that the mother had no desire to change this plan until these proceedings were started by the grandfather. The mother has not even as late as this hearing established a suitable home for the care of the children, the grandparents having been the motivating drive. They promised to take the children in their home and to care for the children. They seem honorable, upright and conscientious. They have in all probability the resources to properly care for the children, but their plan is only a temporary one."

The court then went on to say that the evidence showed that the children had not been kept reasonably clean; that upon one occasion in 1943, when there was an epidemic of polio, one of the

children was tied to a doorknob, had no opportunity to go to the toilet, and as a result was compelled to excrete in its clothing; that numerous flies were attracted, causing extreme danger to the child; that upon two different occasions the children were left alone at night, although they were of very tender age; that the children were compelled to sleep on a dirty mattress which was close to being filthy; that the house was not kept neat and clean; and that upon a number of occasions the children were seen to open up garbage cans and eat some of the contents thereof. The court commented that it might have been able to overlook this unsanitary condition and might have concluded that it had been caused because the mother was working at the time and that she may have changed her ways since her divorce from her first husband, as she did show a neat appearance in court, but that there was another more serious factor in the case — that there was no evidence shown that the mother had a proper love for her children; that soon after the first baby was born she began making plans for a divorce; that in October 1948, when she was told that if she cared to keep the children the aid for dependent children department would help her with financing her home, she was not interested; and that when she was asked if the welfare board should get in touch with her father to see if he would assist her in keeping the children she gave orders that her father was not to be interviewed. The memorandum further stated that the children were placed in a boarding home in October 1948 and that up to the time of the order of December 17, 1949, the mother had made no request to see them; that from October 1948 until February 26, 1949, no guardian had been placed over the children and the mother had an opportunity to see them if she cared to do so; that the mother did not bring the petition, but that it was brought by her father, who obligated himself for the payment of attorneys' fees, as well as other expenses; that although she remarried in June 1949 and knew that she must provide a proper plan for her children she had taken no steps except negligible ones in providing such a plan; and that the plan offered was only a temporary one made by the grandparents. The court then

stated that there was no evidence of any church program for the children during the time they were living with their parents; that the mother walked out of the house, leaving the children with their father, intending to abandon them to the father; that her discipline of the children left much to be desired; that the children were beginning to show familiar patterns of delinquency and that under these conditions it would be easy to conclude that before long they would become delinquency problems. The court stated that prior to the time the grandfather asserted that he desired the children a plan had been made to place the two younger children in a neat adoptive home, where the contemplated foster father was receiving $5,000 a year as a professional man, and that there were strong prospects that the older child would be placed in a home in the near future; and that, although the children had then been removed from their mother for about a year, they had made no request at any time to visit her. In connection with the mother's failure to visit her children, she had explained as her reason that she had taken leave of them and if she saw them again she would have to go through the ordeal all over again and that she could not stand it. It was the court's opinion, in view of the evidence, that it was for the best interests of the children that they be placed for adoption, but stated that if no plan was made within six months to provide them with an adoptive home the court would then entertain a motion for their return to their mother. The court then went on to say that that arrangement should give the CWA reasonable time to prepare a permanent plan for the children, but it might be understood that the motion was denied without exceptions at that time, so that if there was a question of an appeal it could be disposed of before permanent plans were made, and that if the appeal interfered with the placing of the children in a home the six months was to run from the time the appeal was determined.

The second order appealed from herein, dated February 6, 1950, denied a motion to vacate the order of February 28, 1949, which declared the minors to be dependent children and committed them to the guardianship of the CWA, and also denied a motion to

amend the court's order of December 17, 1949, or to reopen the hearing so as to permit the taking of further testimony.

The court in its memorandum in connection with its order of February 6, 1950, said in part:

"The first motion appears to be a duplication of a motion brought in December, except in the motion brought in December there was a motion for an order to the Catholic Welfare Association to turn over the children to the grandparents, Herman Hookom, and his wife, Ruth, but in open court it was explained that what was meant was to turn them over to the children's natural mother. In this motion it moves for an order to turn the children over to the natural parents. * * *

\* \* \* \* \*

"The second motion to have a rehearing is denied. The petitioners had ample time to produce their testimony, and I can see no good to prolong this matter."

While it appears that there have been many extraneous issues injected into this case, the primary object of all courts in such matters, especially in this country, is to secure the welfare of the child and not the special claims of either parent. The cardinal principle is to regard the benefit of the child as the paramount consideration. State ex rel. Flint v. Flint, 63 Minn. 187, 65 N. W. 272. It is also well-settled law in this state that natural parents have the first right to the care and custody of their child, unless the best interests of the child require it to be given into the hands of someone else. State ex rel. Fossen v. Hitman, 164 Minn. 373, 205 N. W. 267; State ex rel. Machgan v. Pelowski, 145 Minn. 383, 177 N. W. 627; State ex rel. Olson v. Sorenson, 208 Minn. 226, 293 N. W. 241.

In the Fossen case this court further said (164 Minn. 375, 205 N. W. 267):

"* * * Best interests in this sense do not mean that the child may have an easier or more luxurious life and greater prospect of inheritance with others than with the natural parents, but rather,

if in the parents there is such a lack of moral stamina or ability to gain a livelihood, that it is made to appear that the child must go without proper education and moral training or suffer want under their care and custody, then the best interests of the child are at stake. Mere poverty of the parents is seldom, if ever, a sufficient ground for depriving them of the natural right to the custody of their child, to say nothing of the statutory right * * *."

In all controversies involving the custody of minor children, the welfare and best interests of the child are the chief consideration and prevail over the natural right of the parent. State ex rel. Larson v. Halverson, 127 Minn. 387, 149 N. W. 664. Moral delinquency and inability to furnish the child with needed care induced the court to temporarily withhold the right to custody of the child in State ex rel. Anderson v. Anderson, 89 Minn. 198, 94 N. W. 681. The right of a parent is well stated and limited in State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N. W. 888; State ex rel. Renning v. Armstrong, 141 Minn. 47, 169 N. W. 249; State ex rel. Machgan v. Pelowski, 145 Minn. 383, 177 N. W. 627.

There is nothing in the record to show that the children were not being properly cared for and protected under the guardianship provided by the court. It is also apparent that up to the time when the court made the orders appealed from neither parent had shown much interest in the welfare of the children. The father certainly did not provide for his family in such a manner as to give them a decent or respectable living, nor do we see anything which indicates that he made much of an effort to do so. Neither is there any explanation as to why he did not or was not required to make a greater effort for his family's welfare. It is understandable that such failure properly to provide for his family could have served as a discouragement for his wife. On the other hand, her conduct appears to have been far below that to be expected of a natural mother, no matter how meager the family circumstances. Love and affection can permeate a home and brighten its atmosphere even though the surroundings are not the best. Such does not seem to have been the situation in the Maloney home. The mother

does not seem to have had sufficient concern for her children to keep them or the house clean, or to look after their general welfare so as to prevent them from becoming delinquents. It seems inconceivable that any natural mother could have tolerated some of the conditions which appear to have existed if she really cared for her children. A mother's care, love, and affection must yield to the welfare of her child, and if it appears that the mother's care and custody will be detrimental to the welfare of the child she should not be awarded its custody. Christianson v. Christianson, 217 Minn. 561, 15 N. W. (2d) 24; Wicklem v. Wicklem, 229 Minn. 478, 40 N. W. (2d) 69.

Based upon their past records up to the time of signing the orders appealed from, it is our opinion that the parents did not show that they were fit or proper persons to have the care and custody of their children; and, considering the best interests of the children, the provisions already made for them should not be changed by this court. We therefore hold that the order of December 17, 1949, above referred to, denying a motion to have the guardianship in the above-entitled matter dismissed and the children referred to therein returned to their natural mother, is affirmed; that the order of February 6, 1950, is affirmed, except that part which denied the motion to reopen the hearing to permit further testimony to be taken, which part of said order is reversed.

The writ of certiorari in case No. 35,288 is quashed. Certiorari cannot be resorted to in review of orders or judgments of inferior courts where there is a remedy by appeal. State ex rel. Scheffer & Rossum Co. v. Kane, 144 Minn. 225, 174 N. W. 884, and cases cited. We also hold that under the facts and circumstances here the writ of habeas corpus was properly quashed, and the appeal in case No. 35,354 is dismissed.

Statutory costs shall not be allowed to any of the parties; disbursements shall be allowed each of the parties hereto in the respective matters in which each has prevailed.

Affirmed in part and reversed in part.

**12**

On October 19, 1951, the following opinion was filed:

Costs—on appeal—disbursements—several appeals—apportionment.

PER CURIAM.

Respondent (CWA) appeals from the taxation and allowance by the clerk of the supreme court of appellants' disbursements.

These proceedings involved three cases. Case No. 35,320 is an appeal from two separate orders of the district court, one dated December 17, 1949, denying a motion to have a guardianship dismissed and to have the minor children returned to their natural mother, and the other dated February 6, 1950, denying a motion to vacate a previous order of the court dated February 28, 1949, which declared the minors to be dependent children and committed them to the guardianship of CWA. The order of February 6, 1950, also denied a motion to amend the court's order of December 17, 1949, or to reopen the hearing in order to permit further testimony. Case No. 35,288 is a certiorari proceeding. Case No. 35,354 is an appeal from an order of the district court quashing a writ of habeas corpus. The three cases arose out of the same general fact situation and were heard at the same time under an order of this court.

Technically speaking, the matters actually involved four appeals, since case No. 35,320 was an appeal from the order of December 17, 1949, and the order of February 6, 1950.

CWA (respondent) prevailed in three of the matters as follows: (1) The order dated December 17, 1949, was affirmed; (2) the certiorari proceedings involved in case No. 35,288 were quashed; and (3) the appeal from the order quashing the writ of habeas corpus in case No. 35,354 was dismissed.

Appellants partially prevailed in one matter, in that the order of February 6, 1950, was reversed in part. While we affirmed that part of the order of February 6, 1950, which denied appellants' motion to vacate the previous order of February 28, 1949, declaring the minors to be dependent children and committing them to the

guardianship of CWA, and affirmed that part of the order of February 6, 1950, which denied appellants' motion to amend the order of December 17, 1949, we reversed that part of the February 6, 1950, order denying appellants' motion to reopen the hearing in order to permit the taking of further testimony.

In concluding our opinion, we stated that statutory costs should not be allowed any of the parties. M. S. A. 607.01 gives us that discretionary power with reference to the allowance of statutory costs. We then said that disbursements should be allowed each of the parties in the respective matters in which each had prevailed. Both parties then attempted to tax their disbursements.

Appellants filed objections to the taxation and allowance of any disbursements to CWA on the ground that CWA was not the prevailing party and that appellants were. CWA appealed to this court from the clerk's taxation and allowance of appellants' disbursements. It based its appeal upon the files and record and the affidavit of one of its attorneys. It contends that the clerk misunderstood that part of the opinion which stated that disbursements be allowed each of the parties in the respective matters in which each prevailed by allowing appellants' disbursements in the total amount to be taxed against CWA and by allowing CWA's disbursements in the total amount to be taxed against appellants, claiming that said taxation is not in accordance with the instructions of this court.

It is our opinion that in the interests of justice the rule adopted in Larson v. Tweten, 185 Minn. 652, 242 N. W. 378, would be applicable here. That was an appeal from the clerk's allowance for disbursements. There were three cases involved, with different plaintiffs in each case, but the defendants were the same in each. The three cases were tried together in district court, and each case was submitted upon the same evidence. All plaintiffs were represented by the same counsel, and counsel for defendants appeared for them in each case. The defendants prevailed in all three cases in the trial court, and plaintiffs appealed all of the cases to this

court. In one of the cases the judgment appealed from was affirmed, but in the other two cases a new trial was granted to plaintiffs. In the three records presented to this court, 294 pages of testimony and evidence were identical. The pleadings and remainder of the record were confined to each particular case. In the allowance of disbursements for the record in the two cases in which a new trial was granted, 75 cents per page was allowed for all except the 294 pages of evidence common to the three cases. As to the 294 pages, an equitable division was made by computing the 294 pages at 75 cents per page, or $220.50, and then allocating one-third thereof to each of the three cases. This court said that was proper, citing Fitzgerald v. Hennepin County Catholic B. & L. Assn. 56 Minn. 424, 428, 57 N. W. 1066, 59 N. W. 191, and Clay County Land Co. v. Alcox, 88 Minn. 4, 8, 92 N. W. 464, 466.

As stated, in the instant case there were technically four appeals involved. One of these was an appeal in habeas corpus proceedings. No costs or disbursements shall be allowed any party to such an appeal. M. S. A. 589.30. This left three matters to be considered. Appellants partially prevailed in one of them, and respondent (CWA) prevailed in two. It is our opinion that an equitable adjustment under the facts and circumstances here requires that appellants be allowed one-third of their disbursements and respondent (CWA) be allowed two-thirds of its disbursements.

This case is distinguished from Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 497, 49 N. W. (2d) 797, 804, in that there the matter considered involved only *one* order of the industrial commission.