David A. SPAETH, Respondent,

v.

Ann WARREN, n/k/a Ann
Hiegel, Appellant.

No. C9–91–879.

Court of Appeals of Minnesota.

Dec. 3, 1991.

Review Denied Jan. 30, 1992.

James R. Peterson, Legal Assistance to Minnesota Prisoners, Minneapolis, for respondent.

Jill I. Frieders, O'Brien, Ehrick, Wolf, Deaner & Maus, Rochester, for appellant.

Considered and decided by KLAPHAKE, P.J., and CRIPPEN and LOMMEN,* JJ.

## OPINION

KLAPHAKE, Judge.

The trial court granted respondent David Spaeth's motion for summary judgment in a paternity action, basing the adjudication on the concession of Ann Hiegel, the child's mother, that Spaeth is the child's biological father. Hiegel appeals from the judgment, raising issues of proper parties to the ac-

tion, best interests of the child, visitation, and appearance of parties at a motion hearing.

## FACTS

Appellant Ann Hiegel and respondent David Spaeth dated from April–August 1987. Hiegel admits that Spaeth is the only man with whom she had sexual intercourse during that time. During July 1987, Hiegel conceived a child, M.J.W., who was born on May 6, 1988.

In December 1987, Spaeth was convicted of second degree burglary and began serving a 38–month prison sentence. Spaeth was released from prison in December 1989. He is currently a college student at St. Cloud State University and works part-time as a nursing assistant. Hiegel has refused contact with Spaeth since before M.J.W.'s birth, and Spaeth has never visited or provided support for M.J.W.

Hiegel married Mark Hiegel in August 1990. Mark Hiegel treats M.J.W. as his own son. In October 1990 Mark Hiegel filed a petition to adopt M.J.W.

While in prison, Spaeth initiated a paternity action to have himself declared the father of M.J.W. Based on the fact that Spaeth's paternity is undisputed, the trial court granted Spaeth's motion for summary judgment, adjudicating Spaeth to be M.J.W.'s father. Spaeth did not appear in person at the motion hearing. The court concluded that Spaeth was entitled to reasonable visitation and owed M.J.W. a duty of support, and that there was no "reasonable purpose" for appointing M.J.W. a guardian ad litem at that time. However, the court did not set visitation or child support and reserved jurisdiction over those issues. Hiegel appeals, contending; (1) M.J.W. and Mark Hiegel should have been made parties to the action (2) the court should have considered M.J.W.'s best interests in determining paternity (3) the court erred in stating Spaeth was entitled to reasonable visitation (4) the record should be corrected to reflect that Spaeth

---

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

did not personally appear at the motion hearing.

## ISSUES

1. Did the trial court abuse its discretion in declining to join M.J.W. and Mark Hiegel as parties to the paternity action?

2. Did the trial court err in failing to consider M.J.W.'s best interests in determining paternity?

3. Did the trial court err in concluding that David Spaeth is entitled to visitation?

4. Did the trial court err in stating that David Spaeth personally appeared at the summary judgment motion?

## ANALYSIS

### I.

■ On appeal from summary judgment, this court reviews the record to determine whether issues of material fact exist and whether the trial court erred in its application of the law. *Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn.1989).

■ Hiegel contends that M.J.W. and Mark Hiegel should have been named as parties to the paternity action under the parentage act, Minn.Stat. §§ 257.51–.74 (1990). Under Minn.Stat. § 257.60 (1990), "[t]he child may be made a party to the action." Thus, the determination whether to join a child as a party is usually discretionary. *See* Minn.Stat. § 645.44, subd. 15 (Supp.1991) ("may" is permissive when used in statutes); Minn.R.Civ.P. 21. However, the parentage act specifically requires the child to be made a party whenever:

> an action to declare the existence of the father and child relationship is brought by a man presumed to be the father * * * or a man who alleges to be the father, and the mother of the child denies the existence of the father and child relationship.

Minn.Stat. § 257.60(3) (1990). This language does not apply here. Although Spaeth is the presumed father, Hiegel does not deny the existence of the father and child relationship. She concedes that Spaeth is M.J.W.'s biological father. *See* Minn.Stat. § 257.52 (1990) (father and child relationship refers only to "biological or adoptive father").

Hiegel asserts that case law requires that children be joined in paternity actions, citing *Johnson v. Hunter*, 447 N.W.2d 871 (Minn.1989). *Johnson* concerned whether res judicata barred a child from bringing a separate paternity action where the mother's paternity action against the same man had been dismissed with prejudice. *Id.* at 874. *Johnson* is thus factually distinguishable from this case because it concerned the issue of whether the child could *initiate* a separate paternity action rather than whether a child could *join* such an action. *Id.* at 872. Moreover, *Johnson* contained a more compelling reason for requiring a child to be joined as a party since denial of the right to bring a separate action would have meant that paternity could not have been established. In allowing the child in *Johnson* to pursue a separate action, the court noted the desirability of requiring children to be joined in paternity actions and suggested that the legislature consider amending permissive language regarding joinder of children. *Id.* at 875. That the legislature has thus far failed to do so is further evidence that joinder under these circumstances is permissive and not mandatory.

■ Here, M.J.W.'s interests were adequately addressed in Spaeth's action, especially since issues of visitation and child support were not determined. We conclude the trial court did not abuse its discretion in declining to join M.J.W. as a party.

■ Hiegel also claims that Mark Hiegel should have been named a party to the action under Minn.Stat. § 257.55, subd. 1(d) (1990) because he met the criteria to be a presumed father. Mark Hiegel would be presumed M.J.W.'s biological father if

> [w]hile the child is under the age of majority, he receives the child into his home and openly holds out the child as his biological child.

*Id.* This section must be construed liberally, to achieve its "remedial and humanitarian purposes." *Larson v. Schmidt,* 400 N.W.2d 131, 134 (Minn.App.1987) (quoting *Weber v. Anderson,* 269 N.W.2d 892, 894–95 (Minn.1978)).

While Mark Hiegel has received M.J.W. into his home, he has not held M.J.W. out as his biological child. He has encouraged M.J.W. to call him "Daddy" and has, commendably, provided him financial and emotional support. However, he has taken no action to assert paternity at any time, and M.J.W. does not use his surname. *See Pierce v. Pierce,* 374 N.W.2d 450, 451 (Minn.App.1985) (man not presumed father where, among other reasons, he "took no action to claim paternity"), *pet. for rev. denied* (Minn. Nov. 4, 1985). Mark Hiegel's decision to petition to adopt M.J.W. rather than pursue a paternity adjudication shows he did not hold himself out to be M.J.W.'s biological father. We conclude the trial court did not abuse its discretion in declining to make Mark Hiegel a party to the action.

## II.

Hiegel further contends the trial court erred in adjudicating paternity without determining whether to do so would be in M.J.W.'s best interests. Minnesota's parentage act is based on the Uniform Parentage Act, 9B U.L.A. 295 (1987) (UPA), which has been adopted in some form by eighteen jurisdictions. 9B U.L.A. (Supp. 1991 at 2). The UPA requires a pre-trial recommendation concerning whether the "best interest of the child" would be served by "a judicial declaration of the [parental] relationship." Unif. Parentage Act § 13, 9B U.L.A. 320 (1987). However, the Minnesota parentage act does not require a pre-trial best interests consideration except when the trial court recommends that the matter be compromised by an agreement between the alleged father, mother, and child, wherein the father and child relationship is not determined but the alleged father undertakes a defined economic obligation to the child. Minn.Stat. § 257.64 (1990). Moreover, other than the pre-trial reference to best interests, neither Minnesota's parentage act nor the UPA suggests that a determination of paternity should include analysis of whether a child's best interests would be served by the adjudication. This is consistent with the purpose of a paternity action, which is to legally determine a biological parent of a child. *See* Minn.Stat. § 257.54 (1990). We note as well that some actions involving children specifically require a best interests analysis. *See, e.g.,* Minn.Stat. § 259.28 (1990) (adoption); Minn.Stat. § 260.221, subd. 4 (1990) (termination of parental rights); Minn.Stat. § 518.17 (1990) (custody); Minn. Stat. 518.175 (1990) (visitation). Here, however, we find no statutory requirement or directive to consider a child's best interests in adjudicating paternity.

Furthermore, Minnesota courts have not interpreted the parentage act to require a best interests analysis. In *Nicholson v. Maack,* 400 N.W.2d 160 (Minn.App.1987), which Hiegel cites as requiring a best interests analysis in all Minnesota paternity actions, the court required a guardian ad litem to consider the best interests of the child in determining whether to initiate a paternity action on behalf of the child. *Nicholson,* 400 N.W.2d at 165. This requirement applied only to the guardian ad litem, not the court, and is consistent with the role of a guardian ad litem in acting on a child's behalf. *See, e.g.,* Minn.Stat. § 260.-155, subd. 4 (1990) (guardian ad litem appointed in juvenile proceedings "to protect the interests of the minor"). *Nicholson* does not require a best interests analysis in paternity actions, nor has any other Minnesota case required its consideration.

In raising the "best interests" issue, Hiegel appears to attempt to address whether Spaeth has met his parental obligations and whether he is fit to be M.J.W.'s father. These issues are more properly determined in an action to terminate parental rights under Minn.Stat. §§ 260.221–.245 (1990). As neither the parentage act nor Minnesota case law requires the child's best interests to be considered in determining paternity, the trial court did not err in adjudicating paternity by following the statutory criteria enumerated in the parentage act.

The dissent has ardently described application of the best interests test in proceedings not involving determinations of parentage. In custody, visitation, adoption, and termination of parental rights proceedings, all related to where and with whom a child will live, the legislature has specifically required the court to consider the child's best interests. The parentage determination here, however, only identifies a child's biological parent. It does not logically follow that because the legislature adopted the best interests standard for living arrangements of a child and omitted that same standard for a legal determination of a biological fact, that the standard should now be judicially grafted onto the parentage act. A child's best interests simply are irrelevant to the biological determination.

We also strongly disagree with the dissent's characterization of three decisions of other jurisdictions as constituting a "trend for considering a child's best interests prior to a paternity adjudication." Of the three named cases, only two emanate from jurisdictions which, like Minnesota, have adopted the UPA. *See In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989); *McDaniels v. Carlson*, 108 Wash.2d 299, 738 P.2d 254 (1987); 9B U.L.A. (Supp.1991 at 2) (Kansas and Washington among the 18 jurisdictions which have adopted the UPA). Minnesota, unlike Kansas and Washington, excised the portion of the UPA referencing "best interest of the child." UPA § 13, 9B U.L.A. 320 (1987); Minn.Stat. § 257.64 (1990). In the third case, *C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990), the court's decision that a putative father had a common law right to bring a paternity action where the mother of the child was married to another man was based not on "best interests of the child," but rather on the existence of a "substantial parent-child relationship" between the putative father and child. *C.C.*, 406 Mass. at 689–90, 550 N.E.2d at 372.

### III.

■ The trial court concluded that Spaeth is entitled to reasonable visitation with M.J.W., but reserved jurisdiction over visitation. Hiegel contends this language could be used by Spaeth to gain visitation with M.J.W. without consideration of the guidelines enumerated in Minn.Stat. § 518.-175 (1990), as required by the parentage act. Minn.Stat. § 257.541, subd. 2 (1990). Minn.Stat. § 518.175, subd. 1 requires the court to grant the noncustodial parent visitation rights "to maintain a child to parent relationship that will be in the best interests of the child." We agree that the order must be modified to state that no visitation schedule may be established without consideration of the required statutory factors. Upon proper motion, the trial court may consider this issue.

### IV.

■ Contrary to the trial court's statement in the order for judgment, Spaeth did not personally appear at the summary judgment motion hearing. This minor error is not a basis for reversal. *See Miller v. Hughes*, 259 Minn. 53, 62, 105 N.W.2d 693, 699 (1960).

### DECISION

Affirmed as modified.

CRIPPEN, Judge (dissenting).

Because I am convinced Minnesota law never permits disregard for the best interest of a child in court determinations of parental rights, I would reverse and remand to determine whether the paternity adjudication conforms to that standard.

### 1. *J.J.B.*, 1986.

It is singularly important that the law in this case is dictated by principles rendering inconsequential the legislature's failure to expressly enunciate the role of a child's best interest in a paternity action. *See In re Welfare of J.J.B.*, 390 N.W.2d 274, 280 (Minn.1986) (court in termination proceeding held "parental rights must yield to the best interest of the child", even though statute concerning termination of parental rights, Minn.Stat. §§ 260.221–251 (1986), did not include such language). The *J.J.B.* court recognized that the "best interests of the child" standard

has long been recognized as the common thread in cases determining, in various other contexts, the circumstances in which children are required to live. *See, e.g., Pikula v. Pikula,* 374 N.W.2d 705 (Minn.1985) (marital dissolution custody determinations); *Grein v. Grein,* 364 N.W.2d 383 (Minn.1985) (modification of child custody award); *Rutten v. Rutten,* 347 N.W.2d 47 (Minn.1984) (visitation rights); *Auge v. Auge,* 334 N.W.2d 393 (Minn.1983) (custodial parent removing child from state); *State ex rel. Kremin v. Graham,* 318 N.W.2d 853 (Minn.1982) (authority to require paternity blood testing); *In re Application of Saxton,* 309 N.W.2d 298 (Minn.1981) (petition for change of surname); *see also* Minn.Stat. § 259.28 (1984) (adoption); Minn.Stat. § 260.191 subd. 1a (1984) (disposition of children abused, neglected, dependent or neglected and in foster care); Minn.Stat. § 518.17, subd. 1(c), (d), (e), (f) (1984) (marital dissolution custody).

*J.J.B.,* 390 N.W.2d at 279.

The *J.J.B.* court saw no basis to distinguish among various child welfare proceedings and adopted the best interest of the child standard as a paramount consideration in parental rights termination proceedings. *Id.* at 279 The court supported this conclusion by noting the importance of emotional and psychological stability "to a child's sense of security, happiness and adaptation" as well as the widespread agreement between experts that permanency is fundamental to a child's development. *Id.* (citing *Pikula,* 374 N.W.2d at 711; J. Goldstein, A. Freud & A. Solnit, *Before the Best Interests of the Child* 31–35 (1979)).

In the instant case, there is no reason to distinguish between paternity establishment procedures and paternity termination procedures. Both risk unsettling the stability of the child and adversely impacting the child's development. In addition, statutes governing parentage proceedings are to be strictly construed because no such action existed at common law. *See* 1 S. Schatkin, Disputed Paternity Proceedings § 15.01 (4th ed. rev. 1991) (citing *Clay v. Clay,* 397 N.W.2d 571 (Minn.App.1986), *appeal dismissed,* 484 U.S. 804, 108 S.Ct. 49,

98 L.Ed.2d 14 (1987)). Therefore, just as in *J.J.B.,* the legislative failure to express the best interest standard for all parentage decisions does not suggest that the judiciary neglect the long standing importance of this standard.

2. Historic principle.

As in *J.J.B.,* recognizing the paramount importance of a child's best interest in a parentage case is consistent with Minnesota's historic approach to issues involving children. The Minnesota Supreme Court, in *State ex rel. Flint v. Flint,* 63 Minn. 187, 65 N.W. 272 (1895), disregarded a statutory provision that the father be given the right to custody of his minor children and held that the court must interfere even though the legislature did not provide for judicial control. *Id.* at 189, 65 N.W. at 273. The court concluded:

> The cardinal principle in such matters is to regard the benefit of the infant paramount to the claims of either parent. While the courts will not lightly interfere with what may be termed the "natural rights" of parents, yet the primary object of all courts, at least in America, is to secure the welfare of the child, and not the special claims of one or the other parent.

*Id.; see also* 1 S. Schatkin, Disputed Paternity Proceedings § 15.01 (filiation or paternity proceeding, under current social philosophy, designed primarily to protect welfare of child) (citing *Schaschlo v. Taishoff,* 2 N.Y.2d 408, 161 N.Y.S.2d 48, 141 N.E.2d 562 (1957)); *Brown v. Chastain,* 416 F.2d 1012, 1027 (5th Cir.1969) (Rives, J., dissenting) (child's right to just determination of child's best interest "is fully as important as a person's right to be free from incarceration"), *cert. denied,* 397 U.S. 951, 90 S.Ct. 976, 25 L.Ed.2d 134 (1970).

Minnesota's traditional consideration of a child's welfare has roots in the English common law. Prior to any legislative protection of maternal rights or children's interest, the Court of Chancery in England departed from the strict rule of granting custody to the father in order to protect the best interest of the child. W. Tiffany, *The*

*Law of Persons and Domestic Relations* 268 (1909). Most courts in America, Tiffany observed, maintain that the best interest of the child must always be considered. *Id.* at 268–73. *See, e.g., State ex rel. Cash v. Lively,* 155 W.Va. 801, 804, 187 S.E.2d 601, 604 (1972) (the best interest of the child is "the polar star" by which decisions must be made which affect children).

### 3. Limited preference for biological parent.

The trial court's approach links to the parentage act a fixed preference for biological parents over non-biological parents. In Minnesota at least, this preference has always given way to a higher principle. Decisions affecting custody require a determination consistent with the best interest of the child even though it may adversely affect the biological parents. *Wallin v. Wallin,* 290 Minn. 261, 265, 187 N.W.2d 627, 630 (1971); *see In re Custody of N.M.O.,* 399 N.W.2d 700, 703 (Minn.App. 1987) (discussing series of cases where Minnesota courts have ruled against biological parents on the basis of the child's best interest).

There is no reason to formulate a contradictory rule of law in adjudicating paternity, a step that also may have adverse impact on children. Moreover, to permit a paternity adjudication without regard for the child's best interest risks danger greater than may be evident in this case. This approach forces adjudication even where undisputed evidence shows this step will substantially damage the child's interest.

### 4. Aim of statute.

The best interest approach is consistent with the purpose of the Uniform Parentage Act. While relationships in the act are defined in biological terms, the determination of biological relationships is only a means to an end.

The act has numerous goals. The act considers the rights of putative parents. In addition, however, the statute is aimed at recovering financial resources that might be available to support a child. This is an interest of both the child and the state. Most important, the act also focuses on preserving the emotional and psychological welfare of the child. *See* Minn.Stat. § 257.66, subd. 3 (1990) (child welfare decisions, including custody modifications, must be in accord with provisions of dissolution code); *see also Ettore I. v. Angela D.,* 127 A.D.2d 6, 14–15, 513 N.Y.S.2d 733, 739 (1987) (recognizing current judicial view that the "chief purpose" of a parentage proceeding is "to secure the health, welfare and happiness of the child") (quoting 1 S. Schatkin, Disputed Paternity Proceedings § 1.09 (4th ed. rev. 1985)).[1]

The Uniform Parentage Act mandates joining children as parties in all paternity proceedings. Unif. Parentage Act, § 9, 9B U.L.A. 312 (1987). Although the Minnesota version of the act states joinder "may" occur, this takes nothing away from the overriding need under the act to protect the child's interest.[2] Minn.Stat. § 257.60

---

**1.** As appellant correctly asserts, this view of parentage proceedings is also supported by 42 U.S.C. § 602(a)(26)(B) (1990) which obligates a public assistance recipient to cooperate in establishing paternity of a dependent child. Under the pertinent legislation, a refusal to cooperate may be justified if it is for good cause, with cause being determined by administrative standards which "shall take into consideration the best interests of the child on whose behalf aid is claimed." *Id.*

**2.** The house version of the bill, authored by Representative Linda Berglin, is the source of this permissive language. Representative Berglin's version was a complete rewriting of the bill, yet there is little discussion of the amendments in the House Judiciary Committee's debate on this bill, held on March 13, 1980.

The legislative history does reveal that the amendments were not considered critical. Judge Joseph Summers testified in favor of a new paternity act, but did not address the specific House amendments. Martin Swaden, speaking on behalf of Minnesota Trial Lawyers Association, voiced concerns over the quantity and timing of the amendments but few specific amendments were discussed. Section 10 of the Bill, codified at Minn.Stat. § 257.60, was not discussed. There is no evidence of subsequent discussion of section 10 in senate proceedings.

Significantly, no legislative history has been produced or found to suggest that the permissive joinder provision was intended to eliminate consideration of the child's interest in some cases. It is reasonable to conclude that a mandate for joinder was eliminated solely to simplify routine cases, an interpretation supported by

(1990). Thus, the Minnesota Supreme Court has recognized the mandate under the uniform version of the act and declared the importance of protecting the child's interest at these proceedings. *Johnson v. Hunter*, 447 N.W.2d 871, 874–75 (Minn. 1989) (child's interest under Minnesota's version of the act would be better served if joinder were mandatory). Moreover, this court has stated that because the child's interest is paramount, a trial court should consider appointing a guardian ad litem, even if it has to be at the parties' expense. *In re Application of Saxton*, 309 N.W.2d 298, 301 (Minn.1981), *cert. denied*, 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982).[3]

As outlined by the *Johnson* court, there is a difference between a parent's interests and those of a child. *Johnson*, 447 N.W.2d at 875–76. While there may be benefits from an accurate establishment of paternity, this court should not assume that such an establishment would always be beneficial.[4] A determination must be made as to whether the end result is consistent with the underlying focus of the act—protecting the welfare of children.

*Johnson*, it is observed, dealt with facts bearing on the choice to initiate parentage proceedings not adjudication of paternity. However, the decision to initiate and the decision to adjudicate have the same effect. Each is determinative of whether paternity is established. There is no reason justifying the determination that only one of these two critical decisions be shaped in accordance with the child's interests.

5. Best interest language of statute.

Specific attention must be given to Minn. Stat. § 257.64 (1990), describing pretrial settlement recommendations in parentage cases. This section adopts the substantive language of the Uniform Act on standards for formulating a compromise agreement. For dispositions concluded through this process, the statute expressly mandates consideration of the best interest of the child.[5] The section provides:

> In reviewing the obligation undertaken by the alleged father in a compromise agreement, the court shall consider the best interest of the child, in the light of the applicable factors enumerated in section 518.17, subdivision 3, discounted by the improbability, as it appears to the court, of establishing the alleged father's paternity or non-paternity of the child in a trial of the action.

Minn.Stat. § 257.64, subd. 1(b).[6]

It may be observed that the comparable Uniform Parentage Act includes a second

subsequent provisions for mandatory joinder in situations with inherent impact on the child's interest. *See* Minn.Stat. § 257.60(3) (1990).

3. We also note that the Uniform Act's paramount concern for the child's best interest should be accorded great weight as the legislature has directed that uniform laws shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them. Minn.Stat. § 645.22 (1990); *see also Layne–Minnesota Co. v. Regents of the Univ. of Minn.*, 266 Minn. 284, 290–91, 123 N.W.2d 371, 376–77 (1963) (intention of draftees of uniform act becomes legislative intent upon enactment).

4. A child may benefit from not having a determination made. *See Nicholson v. Maack*, 400 N.W.2d 160, 165 (Minn.App.1987) (when appointed, guardian must act for child's best interests and this may include refraining from instituting a paternity action); *McDaniels v. Carlson*, 108 Wash.2d 299, 311–12, 738 P.2d 254, 262 (1987) (while acknowledging fact that accurate paternity determinations are generally in child's interest, court stated there are some circum-

stances where child's interest is better served by no paternity determination).

It must be remembered, however, that the issue before us is not to identify the child's best interest, but to determine whether such interest should be considered.

5. Typically, the child's interest at issue here is a consideration for adjudicating paternity and against settling the case without that determination. However, the standard cannot be confined to eliminate other applications. Even in the context of a settlement proposal, the child's interest may be asserted as cause for compromise and settlement.

6. Language of the Uniform Parentage Act parallels the Minnesota provision:

> In reviewing the obligation undertaken by the alleged father in a compromise agreement, the judge [or referee] conducting the hearing shall consider the best interest of the child, in the light of the factors enumerated in Section 15(e), discounted by the improbability, as it appears to him, of establishing the alleged

declaration of the child's interest which is not found in the Minnesota statute. Under the Uniform Act, the trial court is to evaluate

> the probability of determining the existence or nonexistence of the father and child relationship in a trial and whether a judicial declaration of the relationship would be in the best interest of the child.

Unif. Parentage Act, § 13(a), 9B U.L.A. 320 (1987).

The Minnesota statute simplifies the language of the act by eliminating a specific declaration of the trial court's task to evaluate the case. It is evident that this omission has no substantive purpose or effect. In the Minnesota Legislature's substantive declaration on pretrial proceedings, a best interest consideration was provided, modeled after the Uniform Act. Minn.Stat. § 257.64, subd. 1(b).

Section 257.64 stands as an express demonstration of legislative intent that the trial court consider the best interest of the child when deciding whether adjudication should occur.[7]

### 6. Uniform process.

Reserving consideration of child's best interest for future termination proceeding risks needless emotional trauma for the child and custodians. During the period between a paternity action and a termination proceeding, the rights and relationships between the child and those adults interested in the child will be uncertain, creating instability that threatens the child's well being. *J.J.B.*, 390 N.W.2d at 279. In addition, the requirement for a second proceeding wastes the resources of the parties and the court system in cases where a proposed parentage role is disputed.

While a determination of the child's best interest may involve a standard that is less stringent than that used in termination proceedings,[8] the legislature has already allowed use of this standard when the child is made a party and a guardian ad litem is appointed.[9] It is inequitable to deny party status and thus apply a different standard. Those children without guardians are denied the timely consideration of their paramount interests.

Arguments that best interest decisions would overburden the courts and that we cannot craft precise rules for guidance are unpersuasive. We already employ the best interest standard when the child is joined as a party and a guardian is appointed. Moreover, the guiding principle is simply that if the best interest of the child will not be served by a paternity adjudication, then a determination should not be made. This is the same type of flexible standard used effectively by courts in determining other child welfare questions, including parental rights issues in a termination case.

---

father's paternity or nonpaternity of the child in a trial of the action.
Unif. Parentage Act, § 13(a)(2), 9B U.L.A. 320.

**7.** Like the Uniform Act, section 257.64, subdivision 1(b) also declares that "in the best interests of the child" the trial court may order that the alleged father's identity be kept confidential. Minn.Stat. § 257.64, subd. 1(b). This choice for confidentiality also accompanies a proposal for settlement without adjudication of paternity. *Id.* Here again, the legislature has made it evident that the child's best interest is to shape the decision of the trial court on whether paternity will be adjudicated.

**8.** If a stringent standard is deemed a compelling need, the child's interest could be determined in accordance with substantive standards found in the termination statute. *See Wilson v. Barnet,*

275 Minn. 32, 35–36, 144 N.W.2d 700, 702–03 (1966) (employing termination statute to measure parental unfitness that justifies completing an adoption proceeding without a parent's consent). Similarly, it remains to be determined whether an initial preference for adjudication shifts from a petitioning putative father to others the burden to show adjudication would not be in the child's interests.

**9.** If a guardian ad litem is appointed, the guardian may challenge the paternity action on grounds of the child's best interest. *See Nicholson,* 400 N.W.2d at 165 (guardian must act for child's best interest). There is no reason to allow those children with guardians to receive protection through the earlier consideration of the child's best interest, while forcing those children without guardians to endure the rigors of two separate proceedings.

7. Three high court precedents.

A survey of foreign cases reveals a trend for considering a child's best interest prior to a paternity adjudication. All three state high courts which have addressed this issue have included a best interest analysis in parentage cases.[10] *See McDaniels v. Carlson*, 108 Wash.2d 299, 738 P.2d 254 (1987); *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989); *C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990).[11]

*McDaniels v. Carlson* involved a paternity action brought by a man where the mother was married to another man at the time of conception. *McDaniels*, 108 Wash.2d at 301, 738 P.2d at 256. The court addressed the role of public policy and "best interests of the child" in paternity actions brought under the Uniform Parentage Act. The court rejected appellant's argument that every child had a compelling interest in ascertaining its parentage. *Id.* at 310, 738 P.2d at 261.

The Washington court observed that there is general agreement that stability and predictability in family relationships is very important, even where the parent figure is not the natural parent. *Id.* The court concluded that when someone outside the family files a paternity action, the trial judge should consider the impact on the child in determining whether the action should proceed. *Id.*

*In re Marriage of Ross* involved a paternity action brought by mother on behalf of child. *Ross*, 245 Kan. at 593, 783 P.2d at 333. The sole issue discussed in the appeal was whether an evidentiary hearing on the best interests of a child should precede a paternity determination.

The Supreme Court of Kansas decided that the mere filing of a paternity action does not automatically imply that the action is in the child's best interest. *Id.* at 598, 783 P.2d at 336. The court stated that on remand the results of blood tests should not be considered unless such the consideration of the test results is determined, by the court, to be in the best interest of the child. *Id.* at 602, 783 P.2d at 339.

In *C.C. v. A.B.* a putative father filed a paternity action where the child's mother was married to another man at the time of birth. 406 Mass. at 680, 550 N.E.2d at 367. The court, in deciding that the putative father should be able to proceed, focused on the existence of a substantial parent-child relationship. The court stated that the existence or non-existence of such a relationship is relevant in evaluating both the rights of the putative father and the best interest of the child. *Id.* at 689, 550 N.E.2d at 372.

I respectfully dissent.

---

**10.** A Wisconsin Supreme Court decision reaches a similar conclusion. *In re Paternity of C.A.S.*, 161 Wis.2d 1015, 1020–21, 468 N.W.2d 719, 721 (1991). However, on the facts before the *C.A.S.* court, its conclusion conformed to a statute expressly stating

> a party may allege that a judicial determination that a man other than the husband is the father is not in the best interest of the child. *Id.* at 1020–21, n. 1, 468 N.W.2d at 721, n. 1 (quoting Wis.Stat. § 767.458(1m) (1990)).

**11.** The fact that some of these foreign jurisdiction require the appointment of guardians ad litem in paternity actions does not distinguish the instant case. The *McDaniels* court stressed

that it was not bound by the guardian's recommendations. *McDaniels*, 108 Wash.2d at 312, 738 P.2d at 262. Rather, the trial court must balance all of the interests involved, with the child's interest being paramount. None of these cases places weight on mandatory guardian provisions to support is requirement for a best interest analysis in paternity adjudications. Likewise, party status of the child is not germane to the choice of legal standards governing a child welfare decision. The prospect that a child may not be a represented party does not relieve a court of the duty to consider a child's best interest. Thus, although a child is not a party to dissolution proceedings, the child's best interest is still prominently considered.