# C.C. *vs.* A.B. & another.[1]

Hampden. September 13, 1989. - February 21, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

· *Paternity. Legitimacy. Probate Court*, Jurisdiction, Paternity proceeding. *Jurisdiction*, Paternity proceeding, Probate court. *Parent and Child*, Right to visit illegitimate child. *Practice, Civil*, Standing. *Evidence*, Competency, Illegitimacy.

General Laws c. 209C, § 5 (*a*), does not abrogate or modify a putative father's right, as established by prior decisions of this court, to bring an action to establish paternity under the general equity jurisdiction of the Probate Court pursuant to G. L. c. 215, § 6. [681-682] O'CONNOR, J., with whom LYNCH, J., joined, dissenting.

Discussion of the historical status under law of illegitimate children and the trend toward amelioration of the legal disadvantages placed on such children. [682-685]

Discussion of recent decisions of the Supreme Court of the United States acknowledging the right of fathers of illegitimate children, under the due process clause of the United States Constitution, to maintain a relationship with those children. [685-686]

For a putative father to prevail in an action to establish his paternity of a certain child, when the mother of the child is, and was at the time of the child's birth and conception, married to another man, he must prove paternity by clear and convincing evidence. [686-687, 688-689]

At common law, a wife and her husband are no longer incompetent, as a corollary to the presumption of legitimacy, to testify as to nonaccess or impotency during the time relevant to her conception of a child. [687-688]

In the circumstances of an action under G. L. c. 215, § 6, brought by a putative father to establish his paternity of a child born to a woman married to another, where there was clear and convincing evidence of a substantial parent-child relationship, the plaintiff was to be given the opportunity to prove he was the father of the child. [689-691] O'CONNOR, J., with whom LYNCH, J., joined, dissenting.

[1]The Attorney General, intervener.

CIVIL ACTION commenced in the Hampden Division of the Probate and Family Court Department on March 12, 1987.

The case was reported to the Appeals Court by *David G. Sacks*, J. The Supreme Judicial court granted a request for direct review.

*James M. Smith* (*Robert W. Price* with him) for the plaintiff.

*Patricia A. Zak* for the defendant.

*Jon Laramore*, Assistant Attorney General, for the intervener.

NOLAN, J. This case involves the question whether a man, who alleges that he is the father of a child, may bring an action to establish his paternity when the mother of the child is, and was at the time of the child's conception and birth, married to another man.

The plaintiff, C.C., filed a complaint in which he alleged that he is the father of a certain child. The plaintiff sought an adjudication of his paternity and a right of visitation with the child. The defendant, A.B., is admittedly the mother of the child.

The mother moved to dismiss the plaintiff's complaint. She alleged that she was married to a man other than the plaintiff when the child was born and argued that G. L. c. 209C, § 5 (*a*), precluded the plaintiff's action. The plaintiff opposed the mother's motion on the ground that G. L. c. 209C, § 5 (*a*), to the extent that it denied him standing to bring a paternity action, was unconstitutional. Because the validity of a statute was being challenged on constitutional grounds, the Attorney General intervened.

The mother, the plaintiff, and the Attorney General entered into a statement of agreed facts. The parties stipulate that the defendant is the mother of the child and that the child was born on May 19, 1986. At the time of the child's conception and birth the mother lived with the plaintiff and had sexual relations with the plaintiff. During the entire time that the mother lived with the plaintiff, including the time during which the child was born, the mother was married to

another man. The mother and her husband have since reconciled, and they now live together.

When the child was born, she was given the plaintiff's last name. Moreover, the child's middle name derives from the plaintiff's first name. On the child's birth certificate, the plaintiff is listed as the father of the child. The child was baptized in the plaintiff's religion on October 27, 1986. The plaintiff's name is recorded as the child's father on the baptismal record. In his affidavit,[2] the plaintiff averred that, up until the time that he and the mother ended their liaison, he "cared for" the child. The plaintiff also affirmed his interest in maintaining a relationship with the child.

The mother acknowledges that the plaintiff may be the father of the child. After she took the child and left the plaintiff, the mother instituted an action against the plaintiff seeking custody of the child and support payments for the child.

The Probate Court judge reported the case to the Appeals Court. We granted an application for direct appellate review.

We begin our analysis with a consideration of the relevant statute, G. L. c. 209C, § 5 (*a*) (1988 ed.). According to the mother, § 5 (*a*) bars the plaintiff from bringing suit to establish the paternity of her child. General Laws c. 209C was inserted by St. 1986, c. 310, § 16. The avowed purpose of c. 209C is "to establish a means for [children born out of wedlock] either to be acknowledged by their parents voluntarily or, on complaint by one or the other of their parents or such other person or agency as is authorized [by the statute], to have an adjudication of their paternity, to have an order for their support and to have a declaration relative to their custody or visitation rights." G. L. c. 209C, § 1. The purpose of the statute is to deal with actions to establish paternity in the context of children born out of wedlock. Not surprisingly then, § 5 (*a*) contains the following exclusion from the list of persons who may bring an action under the statute: "provided, however, that if the mother of the child was or is married and the child's birth occurs during the marriage or

_____

[2]This affidavit is appended to the parties' stipulation of facts.

within three hundred days of its termination by death, annulment or divorce, complaints under this chapter may not be filed by a person presumed to be or alleging himself to be the father unless he is or was the mother's husband at the time of the child's birth or conception." It is this exclusion which the plaintiff claims is unconstitutional.

Prior to the enactment of G. L. c. 209C, a putative father could seek an adjudication of paternity under the general equity jurisdiction of the Probate Court. See *R.R.K.* v. *S.G.P.*, 400 Mass. 12 (1987); *Normand* v. *Barkei*, 385 Mass. 851 (1982). The putative father's argument in this case assumes that the Legislature's enactment of c. 209C precludes him from bringing such an action. We disagree with that assumption.

General Laws c. 209C, § 5 (*a*), expressly bars a putative father in the plaintiff's position from bringing an action "*under this chapter.*" In light of this clear declaration, we agree with the Appeals Court's recent observation that "nothing in [G. L. c. 209C] . . . limits (or was intended to limit) the scope of the preexisting general equity jurisdiction of the Probate Courts under G. L. c. 215, § 6." *Doe* v. *Roe*, 23 Mass. App. Ct. 590, 595 (1987). In our view, G. L. c. 209C, § 5 (*a*), does not abrogate or modify a putative father's right, as established by prior cases of this court, to bring a complaint to establish paternity under the general equity jurisdiction of the Probate Court.

The critical question in this case is whether the plaintiff may bring an action to establish paternity. It is not enough to conclude, as we do, that the enactment of G. L. c. 209C places no limit on the Probate Court's general equity jurisdiction. We must address the nature of an action to establish paternity.

The law has always drawn a distinction between legitimate and illegitimate children. See 1 W. Blackstone, Commentaries *446. A child who was not legitimate was, at common law, "filius nullius" (the son of no one). *Cooley* v. *Dewey*, 4 Pick. 93, 94 (1826); 1 W. *Blackstone, supra* at *458-460. The status of illegitimacy brought with it a host of social and

legal disabilities. See generally *id.*; 1 H.H. Clark, Law of Domestic Relations in the United States § 5.1, at 278-286 (2d ed. 1987). The English common law placed no obligation on the parents of an illegitimate child to support that child. See *Ruttinger* v. *Temple*, 4 Best & Smith's Rep. 491 (Q.B. 1863).[3] See also *Moncrief* v. *Ely*, 19 Wend. 403, 405-406 (N.Y. 1838). The American courts adopted that view as well. See, e.g., *Commonwealth* v. *Dornes*, 239 Mass. 592, 593-594 (1921); *Simmons* v. *Bull*, 21 Ala. 501, 504 (1852); *State ex rel. Beebe* v. *Cowley*, 116 Ohio St. 377, 379 (1927).[4] An illegitimate child, being filius nullius, could inherit from neither parent under the common law. *Kent* v. *Barker*, 2 Gray 535, 536 (1854). See 1 H.H. Clark, *supra* at § 5.1, at 278-279.[5] Until 1987, use of the word "issue," in

---

[3] In England, the illegitimate child was apparently supported by the parish in which he was born until 1576, when the Elizabethan Poor Law was enacted. 18 Eliz. 1, c. 3 (1576). The purpose of that early English statute was to lessen the financial burden on the parish by requiring putative fathers to support their illegitimate children. See 1 W. Blackstone, *supra* at *458. One commentator has argued that the common law did not impose support obligations on the father of an illegitimate child because such an obligation was enforced in the courts of the English Church. Helmholz, Support Orders, Church Courts, and the Rule of *Filius Nullius*: A Reassessment of the Common Law, 63 Va. L. Rev. 431 (1977). Because there was an ecclesiastical remedy, the secular courts did not develop a doctrine requiring fathers to support illegitimate children.

[4] In Massachusetts, the mother of an illegitimate child did have a duty to maintain the child. *Somerset* v. *Dighton*, 12 Mass. 383, 387 (1815). Although there was no common law requirement that a father support his illegitimate children, there have been statutes requiring such a father's support throughout Massachusetts history. In 1668, the Massachusetts Bay Colony enacted a statute (for the purpose of easing the burden on towns) requiring a man, on conviction, to support his illegitimate children. Colony Laws c. 48, § 3 (1668). Ancient Charters 116 (1814). The Province of Massachusetts Bay enacted a similar law in 1692. Province Laws c. 11, § 5 (1692). Ancient Charters 239 (1814). In 1785, the Commonwealth of Massachusetts enacted St. 1785, c. 66, which was comparable to the laws in the Colony and Province. Many revisions of these "bastardy" laws were made over the last two centuries. See *Department of Revenue* v. *Jarvenpaa*, 404 Mass. 177 (1989). General Laws c. 209C constitutes a complete revision of the law relating to children born out of wedlock.

[5] Statutes were enacted to ease the harsh results of the common law in the area of inheritance rights as well. Statute 1828, c. 139, allowed illegiti-

C.C. *v.* A.B.

the absence of anything indicating a contrary intent, was presumed to mean only legitimate children. See *Powers* v. *Wilkinson*, 399 Mass. 650, 654 (1987).

The common law severely burdened the illegitimate child, imposing harsh results on the child as punishment of the parents' actions. In recognition of the sad lot of illegitimate children, the common law generated a presumption of legitimacy. See 1 H.H. Clark, *supra* at § 5.4, at 341. "The legal presumption always is, that a child born in lawful wedlock is legitimate." *Phillips* v. *Allen*, 2 Allen 453, 454 (1861). While the law has always recognized that a child born to a married woman could nonetheless be an illegitimate child, it created a strong presumption to avoid that result. In England, the presumption could only be overcome by proof that the husband was "*extra quatuor maria* (beyond the four seas), for above nine months," or if "there is an apparent impossibility of procreation on the part of the husband, as if he be only eight years old, or the like." 1 W. Blackstone, *supra* at *457. The application of the presumption has changed somewhat, and it has become rebuttable. But the presumption may only be rebutted by "facts which prove, beyond all reasonable doubt, that the husband could not have been the father." *Phillips* v. *Allen*, *supra* at 454. Accordingly, "it must be shown, 'beyond all reasonable doubt,' either that: (1) the husband had no access to the wife during the time of possible conception; (2) the husband was impotent; or (3) a properly conducted blood grouping test, administered by a qualified expert, definitively excludes the husband as a father." *Matter of J.S.V.*, 402 Mass. 571, 573 (1988). In *P.B.C.* v. *D.H.*, 396 Mass. 68, 71 (1985), cert. denied, 475 U.S. 1058 (1986), we extended the scope of the presumption to include not only a child born to a married woman, but also a child conceived by a married woman.

mate children to inherit from their mothers. Statute 1832, c. 147, allowed inheritance from the father if the parents intermarried and the father acknowledged the child as his own. These statutes have been amended over time and now appear in G. L. c. 190, §§ 5 & 7, respectively.

Society has come to recognize that discrimination against illegitimate children is not justified.[6] As noted, statutes were enacted at an early date to alleviate some of the hardships thrust on illegitimate children by the common law. The United States Supreme Court has invoked the equal protection clause of the Fourteenth Amendment to the United States Constitution to strike down statutes discriminating against illegitimate children. See, e.g., *Trimble* v. *Gordon*, 430 U.S. 762 (1977). This court has noted that numerous Federal statutes reflect the principle that adverse treatment of illegitimate children does not comport with current notions of justice. *Powers* v. *Wilkinson, supra* at 659-660. As we noted in *Powers, supra* at 661, "[o]urs is an era in which logic and compassion have impelled the law toward unburdening children from the stigma and the disadvantages heretofore attendant upon the status of illegitimacy." The enact-· ment of G. L. c. 209C is another step in that direction. In § 1, the Legislature proclaims that "[c]hildren born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children." Thus, the trend of the law has been to remove the disadvantages placed on illegitimate children. It was the avoidance of those disadvantages which gave rise to the strict application of the presumption of legitimacy.

At the same time, the law has come to recognize an interest with which it had not historically dealt. The fathers of illegitimate children have certain rights, under the due process clause of the United States Constitution, to maintain a relationship with those children. See *Stanley* v. *Illinois*, 405 U.S. 645, 651-652 (1972).[7] In the constitutional sense, the

---

[6]Professor Clark, in his treatise on family law, discusses a sharp increase in the number of illegitimate births. Clark, *supra* at § 5.1, at 280. Between 1940 and 1974 the rate of illegitimate births in the United States per 1,000 unmarried women between the ages of fifteen and forty-four more than trebled. *Id.* Thus, the makeup of our society itself is changing.

[7]Because "bastardy" was historically punished as a criminal offense, see *Commonwealth* v. *MacKenzie*, 368 Mass. 613, 614-615 (1975), it is perhaps understandable that fathers were less than eager to seek, by court order, a relationship with their illegitimate children.

father's interest is not one of a biological nature alone. Rather, the protected interest arises when there is a substantial relationship between a putative father and an illegitimate child. Compare *Lehr* v. *Robertson*, 463 U.S. 248 (1983), and *Quilloin* v. *Walcott*, 434 U.S. 246 (1978), with *Caban* v. *Mohammed*, 441 U.S. 380 (1979), and *Stanley* v. *Illinois*, 405 U.S. 645 (1972). In a case with facts similar to the instant case, four Justices of the United States Supreme Court felt that a "natural father" had a protected liberty interest in the relationship with his child. *Michael H.* v. *Gerald D.*, 109 S. Ct. 2333, 2349-2363 (1989) (dissenting opinions of Brennan and White, JJ.). One Justice refused to "foreclose the possibility that a protected relationship between a natural father and his child might exist in a case like this." *Id.* at 2347 (Stevens, J., concurring). In recent years, this court has also dealt with the claims of unwed fathers who desire contact with their illegitimate children. See, e.g., *Normand* v. *Barkei*, 385 Mass. 851 (1982); *Gardner* v. *Rothman*, 370 Mass. 79 (1976).

The case sub judice involves a clash of the interests of the plaintiff, an unwed putative father, and the interest in preserving the legitimacy of the child that the plaintiff claims to have sired. We continue to adhere to the common law principle that motivated the presumption of legitimacy — that there is a strong interest in not bastardizing children. We are no longer convinced, however, that that interest can be protected only by requiring the rebuttal of a presumption by proof beyond a reasonable doubt. In view of the gradual betterment of the illegitimate child's legal position, which weakens the purpose behind the presumption, coupled with the corresponding recognition of the interests of unwed putative fathers, we think that there is no longer any need for a presumption of legitimacy. The interests involved can be adequately protected by requiring that a putative father in the plaintiff's position be required to prove paternity by clear and convincing evidence.

The function of a standard of proof is to "instruct the factfinder concerning the degree of confidence our society

thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring). Proof beyond a reasonable doubt was required to rebut the presumption of legitimacy because of the enormous importance of avoiding the conclusion that a child was illegitimate. Under that framework, the interests of the unwed father who claimed to have sired a child by a married woman were, by necessity, considered of little importance. The entire risk of an erroneous judgment was placed on the unwed father who sought to pursue a relationship with his child. We think that the father's interest warrants greater recognition. The requirement that the putative father prove paternity by clear and convincing evidence better allocates the risks of error involved in cases such as this one and gives better recognition to the competing interests involved.

Proof of paternity must rest in the evidence. The effect of the common law presumption of legitimacy was, in many instances, to prevent the fact finder from reaching the true issue in the case. The advances of modern science make determinations and exclusions of paternity much more accurate than was ever historically possible. In this context we think it preferable that a putative father in the plaintiff's position be able to produce the evidence he has on the issue of paternity.[8] Placing a barrier between the plaintiff and the fact finder by requiring that the plaintiff first prove, beyond a reasonable doubt, nonaccess, impotency, or scientific exclusion of the husband, is no longer warranted. To be sure, those issues are still relevant, but they should not be dispositive on the issue whether the plaintiff is indeed the father of the child.

A related issue of evidence arises with regard to proof of nonaccess. As a corollary to the presumption of legitimacy,

---

[8]As we explain *infra*, a plaintiff must make a preliminary showing that there is a substantial parent-child relationship between himself and the child. Thus, our holding today will not allow every person alleging himself to be the father of a child born to a married woman to produce evidence of paternity.

there evolved a rule, known as Lord Mansfield's Rule, which provided "that where the legitimacy of a child born in lawful wedlock is in issue, in the absence of statutory authority neither the husband nor the wife may testify as to nonaccess between them." *Sayles* v. *Sayles*, 323 Mass. 66, 67 (1948), quoting *Taylor* v. *Whittier*, 240 Mass. 514, 515-516 (1922). Statutory schemes in Massachusetts have generally allowed testimony in contravention of the rule. See, e.g., G. L. c. 209C, § 16; G. L. c. 273, § 7. Thus, in practical terms, the rule has been of little effect. In *Symonds* v. *Symonds*, 385 Mass. 540, 543-544 (1982), we discussed the severe criticism to which the rule has been subjected. We have no doubt that we should abandon the rule today. As a matter of the common law, a wife and a husband are no longer incompetent, by operation of Lord Mansfield's Rule, to testify as to nonaccess or impotence during the time relevant to conception.

In altering the nature of the common law action to establish paternity, we are not acting without guidance. Modern trends in the law, combined with changes in social attitudes, have brought into question the continuing validity of archaic rules which obfuscate the truth-seeking principles our system of jurisprudence strives to achieve. The Legislature, in G. L. c. 209C, has effectively eliminated the presumption of legitimacy. Under c. 209C, a married woman may bring an action against a man other than her husband to establish paternity. G. L. c. 209C, § 5 (*a*). The only requirement is that she prove paternity by clear and convincing evidence. G. L. c. 209C, § 7. The Department of Public Welfare (department) may similarly bring a paternity action against a man other than the husband if the child is or was a recipient of public assistance. G. L. c. 209C, § 5 (*a*). The department must prove paternity by clear and convincing evidence. G. L. c. 209C, § 7. Under G. L. c. 209C, § 16, both a married woman and her husband may testify to nonaccess during the relevant time period. In light of these legislative statements of contemporary policy, and in light of the competing interests involved in this case, we think the common law should move forward. The common law is "designed to meet

and be susceptible of being adapted 'to new institutions and conditions of society . . . new usages and practices, as the progress of society in the advancement of civilization may require.'" *Commonwealth* v. *Gallo*, 275 Mass. 320, 333 (1931), quoting *Commonwealth* v. *Temple*, 14 Gray 69, 74 (1859). Our decision today fairly balances the interests present in modern society.

We now proceed to the dispositive issue — whether a man in the plaintiff's position is entitled to bring an action to establish paternity pursuant to G. L. c. 215, § 6. In *P.B.C.* v. *D.H.*, 396 Mass. 68 (1985), we held that a man other than the husband has no common law right, *in all circumstances*, to be heard on the question of paternity. In the circumstances of this case, we think that the putative father has such a right. The parties' statement of agreed facts indicates, as already noted, that the mother, although married to another man, lived with the plaintiff at the time that the minor child was conceived and when the child was born. The plaintiff's name is listed as "father" on the child's birth certificate and on the child's baptismal record. The child bears the plaintiff's name. The mother has admitted that the plaintiff may be the father of the child.[9] After the child's birth, the plaintiff, the mother, and the child lived together. The plaintiff has indicated, both by his actions and his words that he has an interest in continuing his relationship with the child. On this record, there is sufficient evidence of a substantial parent-child relationship between the plaintiff and the child to allow the plaintiff to proceed with his paternity action.

The existence of a substantial parent-child relationship is, in our view, the controlling factor in determining whether this plaintiff may pursue his claim. The United States Supreme Court has indicated that, "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rear-

---

[9]In addition, the record indicates that the mother's husband has filed a petition to adopt the child. The petition lists the plaintiff as the father of the child.

C.C. *v.* A.B.

ing of his child,' . . . his interest in personal contact with his child acquires substantial protection under the Due Process Clause." *Lehr* v. *Robertson*, 463 U.S. 248, 261 (1983), quoting *Caban* v. *Mohammed*, 441 U.S. 380, 392 (1979). See *Michael H.* v. *Gerald D.*, 109 S. Ct. 2333, 2347 (1989) (Stevens, J., concurring) ("enduring 'family' relationships may develop in unconventional settings"). Quite apart from the constitutional implications, we think that the existence of a substantial relationship between a putative father and the child is an appropriate prerequisite for the commencement of an action such as this.[10] "[T]he existence or nonexistence of a substantial relationship between the putative father and child is relevant in evaluating both the rights of the parent and the best interests of the child." *R.R.K.* v. *S.G.P.*, 400 Mass. 12, 21 (1987) (Liacos, J., concurring). It is the developed parent-child relationship of which both the plaintiff and the child were suddenly deprived, that the plaintiff seeks to renew. Accordingly, in cases such as this, the Probate Court must hold a preliminary hearing to determine the extent of the relationship between the putative father and the child. This is, in its nature, a fact-based question. The court must look at the relationship as a whole and consider emotional bonds, economic support, custody of the child, the extent of personal association, the commitment of the putative father to attending to the child's needs, the consistency of the putative father's expressed interest, the child's name, the names listed on the birth certificate, and any other factors which bear on the nature of the alleged parent-child relationship.

The requirement of showing a substantial parent-child relationship serves another important interest as well. In cases where the mother of a child is married and living with her husband, there is admittedly an extant marital relationship on which the plaintiff's action will intrude. The traditional family unit is at the core of our society. Despite a vast array

---

[10]We do not, nor need we, decide what rights a putative father might have in a case where, due to the actions of the mother, he had not yet formed a substantial relationship with the child.

of recent challenges to the traditional concept of the family, our civilization still places inestimable value on the importance of family life. Without regard to the outcome of a paternity case, even the very trial of such a case might place great strain on a unitary family. Where, however, the plaintiff has exhibited that he has had a substantial parent-child relationship with the child, it will certainly come as no surprise to the marital family that there is a question as to paternity. If the plaintiff cannot come forward with clear and convincing evidence of such a relationship, he will not be able to proceed beyond the preliminary stages of the action. The family will be protected against significant intrusion. If, on the other hand, the putative father can demonstrate that he has enjoyed a substantial relationship with the child, then his interest warrants protection and the interest in protecting a family which, by necessary implication, has already suffered substantial interference (by the acts of one of the marital partners) is greatly decreased. In these circumstances, the putative father should be allowed to proceed with his action.

In view of our conclusion that the plaintiff has a viable cause of action at common law, we need not address his contention that G. L. c. 209C, § 5 (*a*), denies him due process of law. We do not address the issue of what rights this plaintiff may have if he succeeds in establishing paternity. The overriding principle in determining those rights must be the best interest of the child. We limit our decision to the conclusion that the defendant's motion to dismiss should be denied and that the plaintiff should be given the opportunity to prove paternity. The case is remanded to the Probate Court.

*So ordered.*

O'CONNOR, J. (dissenting, with whom Lynch, J., joins). The issue presented by this case is whether the plaintiff has standing to invoke the jurisdiction of the Probate Court to inquire into and decide whether he is the father of a child born to a woman who (1) was married to another man when

the child was conceived and born, and (2) now lives with that husband, who accepts the child as his own. Stated another way, the issue is whether, in those circumstances, the husband is conclusively presumed to be the father. If he is, evidence to the contrary is legally irrelevant. See *Michael H.* v. *Gerald D.*, 109 S. Ct. 2333, 2340 (1989).

The court's abundant discussion of the evidentiary rebuttable presumption of legitimacy, the court's expressed abandonment of that evidentiary principle, and its substitution of a rule "requiring that a putative father in the plaintiff's position be required to prove paternity by clear and convincing evidence" have no bearing on the issue before the court. Consideration of the adequacy of evidence and the proper standard by which a plaintiff's paternity is proven assumes that the answer to the issue before the court is that, in the circumstances of this case, the husband is not deemed the father as a matter of law and the putative father has standing to litigate the paternity issue. Because the court's discussion assumes the answer to the issue, the discussion does not contribute to its resolution.

Not until the fourth quarter of its opinion does the court address the issue. There it announces its decision that a man in the plaintiff's position has a right, not as a matter of constitutional guarantee but as a matter of policy, to be heard on the question of paternity. *Ante* at 689. Reasoning that "[t]he existence of a substantial parent-child relationship is . . . the controlling factor in determining whether this plaintiff may pursue his claim," the court concludes that, "[o]n this record, there is sufficient evidence of a substantial parent-child relationship between the plaintiff and the child to allow the plaintiff to proceed with his paternity action." *Ante* at 689.

The existence of a substantial parent-child relationship is important to a determination whether a putative father of a child *born out of wedlock* has a due process right to assert his fatherhood. In cases involving a man's claim that he is the father of a child born to an unmarried mother, the United States Supreme Court has said: "When an unwed fa-

ther demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' . . . his interest in personal contact with his child acquires substantial protection under the Due Process Clause." *Lehr* v. *Robertson*, 463 U.S. 248, 261 (1983), quoting *Caban* v. *Mohammed*, 441 U.S. 380, 391 (1979). See *Quilloin* v. *Walcott*, 434 U.S. 246 (1978); *Stanley* v. *Illinois*, 405 U.S. 645 (1972). The fact, however, that a substantial parent-child relationship is important in assessing the constitutional right of a putative father in the child-born-out-of-wedlock context suggests nothing with respect to whether, as a matter of constitutional analysis or mere policy, such a relationship ought to be recognized as bearing in any significant way on the question whether the putative father may assert that he is the father of a child born in wedlock. There is an immense difference between the two situations. Justice Scalia, in *Michael H.* v. *Gerald D.*, *supra*, a case remarkably similar to the case at bar, explains why this is so.

The plaintiff's argument in *Michael H.* was "predicated on the assertion that [he had] a constitutionally protected liberty interest in his relationship with [the child]." *Id.* at 2341. Justice Scalia, writing for a plurality consisting of the Chief Justice, Justice O'Connor, Justice Kennedy, and himself, noted that the term "liberty" in the due process clause extends beyond freedom from physical restraint to interests that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.*, quoting *Snyder* v. *Massachusetts*, 291 U.S 97, 105 (1934). The plaintiff in *Michael H.* had argued that *Lehr* v. *Robertson*, *supra*, *Caban* v. *Mohammed*, *supra*, *Quilloin* v. *Walcott*, *supra*, and *Stanley* v. *Illinois*, *supra*, established that a liberty interest for due process clause purposes was "created by biological fatherhood plus an established parental relationship." *Id.* at 2342. In response to the plaintiff's argument, Justice Scalia wrote: "We think that distorts the rationale of those cases. As we view them, they rest not upon such isolated factors but upon the historic respect — indeed, sanctity would not be too strong a term — traditionally accorded to the relationships

that develop within the unitary family." *Id.* at 2342. In a footnote, Justice Scalia explains: "The family unit accorded traditional respect in our society, which we have referred to as the 'unitary family,' is typified, of course, by the marital family, but also includes the household of unmarried parents and their children. Perhaps the concept can be expanded even beyond this, but it will bear no resemblance to traditionally respected relationships — and will thus cease to have any constitutional significance — if it is stretched so far as to include the relationship established between a married woman, her lover and their child . . . ." *Id.* at 2342 n.3.

The legal issue in *Michael H.* v. *Gerald D., supra,* then, according to Justice Scalia, was whether the relationship between the plaintiff stranger to the mother's marriage and the child "has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection." *Id.* at 2342. He wrote: "We think it impossible to find that it has. In fact, quite to the contrary, our traditions have protected the marital family . . . against the sort of claim Michael asserts" (footnote omitted). *Id.*

Because the "unitary family" accorded traditional respect may include the putative father, mother, and child born out of wedlock, but does not include the mother, child born in wedlock, and the mother's lover, the substantial parent-child relationship test applicable in the former context has no relevancy to the latter either as a matter of constitutional analysis or for policy formation purposes.

The holding in *Michael H.* v. *Gerald D., supra,* makes clear that the plaintiff herein does not have a constitutionally protected interest in obtaining an adjudication that he is the father of the child. The court here does not contend that he does, but instead declares that, as a matter of judicially declared policy (common law), the plaintiff is entitled to an adjudication of paternity if he demonstrates a substantial parent-child relationship between himself and the child. In my view, the court misapplies the substantial parent-child relationship factor to the issue raised by this case.

The court errs too by addressing the issue before it as though the court were writing on a clean slate, which it is not. The policy question has been addressed by the Legislature and for that reason is not open to the court. When the elected representatives of the people have declared the Commonwealth's policy on a matter within their jurisdiction, the court exceeds its lawful powers by announcing an inconsistent policy. General Laws c. 209C (1988 ed.) provides for the rights of children born to parents who are not married to each other. Section 5 (*a*) provides with respect to complaints to establish paternity that such a complaint may be commenced by, among other persons, the putative father, "provided, however, that if the mother of the child was or is married and the child's birth occurs during the marriage or within three hundred days of its termination by death, annulment or divorce, complaints under [c. 209C] may not be filed by a person . . . alleging himself to be the father unless he is or was the mother's husband at the time of the child's birth or conception." It is true, as the court asserts, that G. L. c. 209C, § 5 (*a*), expressly bars a putative father in the situation of this plaintiff only from bringing an action "under this chapter"; that is, under c. 209C. But the social policy that motivated that enactment is quite clear: namely, that the unitary family traditionally respected by society and sought to be protected by the Legislature includes the family of the mother, her husband, and the child, and does not include the mother, child, and the mother's lover. The Legislature has made clear that the policy of this Commonwealth is to withhold from a plaintiff a judicial forum in which to launch an attack on the legitimacy of a child and to otherwise disrupt family harmony.

The court decided *P.B.C.* v. *D.H.*, 396 Mass. 68 (1985), in October, 1985, nearly four years before the United States Supreme Court decided *Michael H.* v. *Gerald D.*, 109 S. Ct. 2333 (1989). Perhaps, as I discuss below, it is more significant that *P.B.C.* v. *D.H.*, *supra*, was decided approximately eight months before the Legislature enacted G. L. c. 209C. See St. 1986, c. 310, § 16 (effective July 22, 1986). In

*P.B.C.*, the plaintiff contended that he had "a right to an adjudication of whether he [was] the father of a child conceived while the child's mother, the defendant, was married to another man." *Id.* at 68. We held that "in the circumstances of [that] case he ha[d] no such right." *Id.* The "circumstances" were as follows: The child was conceived while the mother was married to a man other than the plaintiff. A divorce followed. The child was born the day after the divorce became final. The child lived continuously with the mother, and never with the plaintiff, who was denied access to the child by the mother after he filed his complaint asserting paternity. The mother and her former husband remarried the day after the complaint was filed. The child's birth certificate listed the husband as the father. The husband never denied that he was the father, and, beginning with the month in which the complaint was filed, the mother, husband, and child lived together continuously.

Fully aware of *Stanley* v. *Illinois*, 405 U.S. 645 (1972), the court concluded in *P.B.C.* that, in the circumstances of that case, the plaintiff not only had no constitutional right to an adjudication of paternity, but that he also had no such right "as a matter of public policy." *Id.* at 71-72. Because the Legislature had not yet directly spoken to the question in 1985, it was appropriate for the court to declare policy with respect to whether the Commonwealth should provide a forum to hear paternity cases instituted by a putative father when the child's mother was married to another man at the time of conception or birth. The policy declared by the court was based on the Commonwealth's "legitimate and strong interests in 'the strengthening and encouragement of family life for the protection and care of children,' G. L. c. 119, § 1 (1984 ed.), and in affording legitimacy to children. *Powers* v. *Steele*, 394 Mass. 306, 310 (1985)." *Id.* at 73. "Denying a plaintiff the right to establish his paternity in the circumstances of [that case]," the court said, "promotes [those] interests." *Id.*

General Laws c. 209C, § 5 (*a*), provides in relevant part that, "if the mother of the child was or is married and the

child's birth occurs during the marriage or within three hundred days of its termination . . . complaints under [that chapter] may not be filed by a person . . . alleging himself to be the father unless he is or was the mother's husband at the time of the child's birth or conception." That provision gives every appearance of being not only a legislative adoption of the public policy expressed in *P.B.C.* eight months earlier, but of an adoption of that policy without limitation to the precise circumstances of that case. The principal thrust of the policy announced in *P.B.C.* was that the Commonwealth's interest in affording legitimacy to children, and in strengthening and encouraging family life for the protection of children, demands that a plaintiff not have standing to contend that a child whose mother was married to another man at the time of conception or birth is the plaintiff's child. The Legislature has expressed that policy in G. L. c. 209C, § 5 (*a*). For that reason, I dissent from the court's decision.[1]

---

[1] If, contrary to the views I have expressed, the question of public policy were open to the court, I would strongly disagree with the policy declared by the court because it is antithetical to the Commonwealth's legitimate interest in promoting family harmony for the care and protection of children and affording legitimacy to children whenever possible. I would not accept the proposition that it is sound public policy to recognize a man's interest in maintaining a relationship with the child that he claims to have fathered by an adulterous, and therefore criminal, see G. L. c. 272, § 14 (1988 ed.), relationship with the child's mother at the expense of making the child illegitimate and disrupting a "unitary family." It seems to me strange public policy to declare adultery to be so contrary to public policy as to be criminal, and yet to reward the adulterer by giving him the right to disrupt the child's family life.

I note that the court does "not address the issue of what rights this plaintiff may have if he succeeds in establishing paternity." *Ante* at 691. I suggest that that issue is critical to the policy question the court addresses. Surely, the Commonwealth ought not provide a forum to determine the relationship between the plaintiff and a child he alleges is his unless certain parental prerogatives will follow. The critical question is whether the Commonwealth ought to award substantive parental rights to someone who, like the plaintiff, claims to be the "natural father of a child conceived within and born into an extant marital union that wishes to embrace the child." *Michael H.* v. *Gerald D.*, 109 S. Ct. 2333, 2344 (1989). "We are not aware," writes Justice Scalia, "of a single case, old or new, that has done so." *Id.* As I see it, as to this matter, Massachusetts should not go first.