## D.H. *vs.* R.R.

Worcester. October 6, 2011. - March 28, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Paternity. Legitimacy. Evidence,* Paternity. *Probate Court,* Paternity proceeding.

In a Probate and Family Court proceeding in which a complainant sought to establish paternity of a child born to a woman with whom he had been living (and who was deceased at the time of the action), but who, unbeknownst to the complainant, was married to another man at the time of the child's birth, the judge correctly vacated, more than one year after it had been executed, a voluntary acknowledgement of parentage by the mother and the complainant and dismissed a custody action in which judgment had entered awarding custody of the child to the complainant, where the statutory time limitations to rescind or challenge the acknowledgement did not apply, in that the husband had not executed an affidavit denying his paternity during the mother's lifetime, and thus the voluntary acknowledgement of parentage was not effective as a matter of law and lacked the force or effect of a judgment of paternity. [759-763]

COMPLAINT filed in the Worcester Division of the Probate and Family Court Department on September 4, 2008.

A motion to vacate a voluntary acknowledgment of paternity was heard by *Ronald W. King,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James B. Stanton* for the father.

*Brian R. Pariser* for Department of Children & Families.

*Dorothy Meyer Storrow* for the child.

*Pauline Quirion & Christina Paradiso,* for Children's Law Center of Massachusetts & others, amici curiae, submitted a brief.

GANTS, J. When Karen (pseudonym) was born on November 21, 2007, D.H., her mother, was married but living with R.R., who believed that he was Karen's biological father and did not know that the mother was married to another man (husband).

The day after Karen's birth, the mother and R.R. executed a voluntary acknowledgment of parentage in which the mother swore or affirmed that she was not married, and R.R. acknowledged his paternity. On March 2, 2010, after the mother had died and genetic marker testing had revealed that R.R. was not her biological father, a judge in the Probate and Family Court allowed Karen's motion to vacate the voluntary acknowledgment of parentage and a judgment of support, custody, and visitation that was based on the voluntary acknowledgment of parentage. The issue presented on appeal is whether the judge was correct in vacating the voluntary acknowledgment of parentage, where it was not challenged until more than one year after it was executed, where after the mother's death the mother's husband signed an affidavit denying paternity, and where the judge made no finding as to Karen's best interests. We conclude that the judge properly vacated the voluntary acknowledgment of parentage and the judgment that rested on it, and we therefore affirm the judgment.[1]

*Background.* On November 21, 2007, more than fourteen months after the mother and the husband were married, the mother gave birth to Karen. On November 22, 2007, the mother and R.R. executed a voluntary acknowledgment of parentage, in which R.R. acknowledged his paternity and the mother, under the penalties of perjury, declared that she was not married when the child was born or within 300 days of the child's birth.[2] Karen's birth certificate identified R.R. as the father.

---

[1] We acknowledge the amicus brief filed by Children's Law Center of Massachusetts, Community Legal Aid, and Greater Boston Legal Services.

[2] The voluntary acknowledgment of parentage form asks the mother to check one of two boxes. She checked the box that declared, "I swear or affirm that when this child was born or within 300 days of the child's birth, I was *not* married" (emphasis in original). The box she did not check declared:

> "I swear or affirm that when this child was born or conceived, I was married to someone other than the father of this child. I understand that this form is not effective unless it is accompanied by an Affidavit of Nonpaternity signed by the man to whom I was married or unless the court has determined that the man to whom I was married is not the child's father."

The husband did not execute an affidavit of denial of paternity until August 7, 2009, eleven days after the mother's death.

On September 4, 2008, the mother filed a complaint for support, custody, or visitation (custody action) in the Probate and Family Court that named R.R. as Karen's father and requested custody. The husband was not named as a party or given notice of this complaint. On November 17, 2008, the judge entered judgment, incorporating a stipulation of the parties that granted joint legal custody to the mother and R.R., and sole physical custody to R.R.[3]

On April 9, 2009, the husband filed a complaint for divorce against the mother that did not identify any children of the marriage. The mother died on July 27, 2009, and the divorce complaint was not adjudicated before her death. It was later dismissed because of her death.

On July 29, two days after the mother's death, the Department of Children and Families (department) filed a care and protection petition in the Juvenile Court and was awarded temporary custody of Karen. An attorney was appointed to represent Karen.[4]

On August 7, the husband filed a motion to intervene in the Probate and Family Court custody action, and to vacate the judgment in that matter. On that date the husband also executed an affidavit of denial of paternity, as well as an adoption surrender in which he unconditionally surrendered Karen to the department "for the purpose of adoption or such other disposition."

On September 16, 2009, R.R. filed a complaint in equity pursuant to G. L. c. 215, § 6, in the Probate and Family Court to establish his paternity of Karen. At a hearing the next day, attended by attorneys for R.R., the husband, Karen, and the department, the judge asked whether there was any objection to his ordering R.R. and Karen to undergo genetic marker testing. R.R.'s attorney did not object after the judge assured him that the November 17, 2008, judgment in the custody action award-

---

[3]On September 24, 2008, the child support enforcement division of the Department of Revenue filed a complaint in the Probate and Family Court on behalf of R.R., seeking a child support order against the mother. Here, too, the husband was not named as a party or given notice of the complaint. The record reflects that a judgment of support was filed on June 18, 2009, but does not reflect the substance of that judgment.

[4]The Department of Children and Families continues to retain temporary custody of Karen.

ing custody of Karen to R.R. would stand pending the results.[5] With that same assurance, the judge dismissed the complaint in equity without prejudice and denied the husband's motion to intervene.[6]

On February 25, 2010, after the results of the genetic marker tests established that R.R. is not Karen's biological father, Karen moved to vacate R.R.'s voluntary acknowledgment of parentage. On March 2, 2010, after a hearing, the judge allowed Karen's motion and vacated the voluntary acknowledgment of parentage. On March 9, a judgment dismissing the custody action entered.

R.R. moved for a stay of the order and for an issuance of findings. Both motions were denied, but the judge wrote, "It is clear [R.R.] is not the father and the initial filing was filed in violation of the statute and was a fraud on this court." R.R. then appealed to the Appeals Court from the order vacating the voluntary acknowledgment of parentage and the dismissal of the judgment, and we transferred his appeal to this court on our own motion.

*Discussion.* While the common law has always recognized that a child born to a married woman may not have been fathered by her husband, it created a strong presumption of legitimacy to avoid the disadvantages to the child associated with illegitimacy and to safeguard the traditional family. See *C.C.* v. *A.B.*, 406 Mass. 679, 684, 686, 690-691 (1990). See also *R.R.K.* v. *S.G.P.*, 400 Mass. 12, 15 (1987). The presumption has endured, but the strength of the presumption has diminished. In 1861, this court recognized that "[i]t is established law, that every child born in

---

[5]R.R. had earlier asked a judge of the Juvenile Court to order genetic marker testing, but the record suggests that the Juvenile Court judge deferred to the judge of the Probate and Family Court to issue the order because the judgment as to custody had been issued by that court. R.R. now challenges the judge's sua sponte order of September 16, 2009, that he and Karen undergo the testing, but because he had asked the judge in the Juvenile Court to order this testing and did not object to the order when the judge in the Probate and Family Court assured him that the judgment as to custody was to remain in effect, he has waived his ability to challenge the order on appeal. *Adoption of Mary*, 414 Mass. 705, 712 (1993) ("Generally, issues not raised by a losing party in the trial court are not addressed on appeal, absent exceptional circumstances").

[6]R.R. does not appeal from that dismissal.

wedlock . . . is presumed to be legitimate, even though the parties are living apart by mutual consent." *Hemmenway* v. *Towner*, 1 Allen 209, 209 (1861). At that time, the presumption could be rebutted by proof beyond a reasonable doubt that the husband was impotent or that he had "no access to his wife" during the time when the child could have been conceived. *Id.* at 209-210. See *Phillips* v. *Allen*, 2 Allen 453, 454 (1861). See also *R.R.K.* v. *S.G.P.*, *supra*. In 1957, this court recognized a third means to overcome the presumption of legitimacy: a blood grouping test properly conducted by a qualified expert that definitively excludes the husband as the father. *Commonwealth* v. *Stappen*, 336 Mass. 174, 177 (1957). See *Commonwealth* v. *Beausoleil*, 397 Mass. 206, 224 (1986) (certain statistical evidence derived from human leukocyte antigen tissue typing test results admissible in paternity action).[7]

In 1986, the Legislature created a new statutory scheme to address children born out of wedlock. See G. L. c. 209C, inserted by St. 1986, c. 310, § 16. The purpose of c. 209C, as expressed in the legislation itself, is to establish a means for children born out of wedlock "either to be acknowledged by their parents voluntarily or . . . to have an acknowledgment or adjudication of their paternity, to have an order for their support and to have a declaration relative to their custody or visitation rights ordered by a court." G. L. c. 209C, § 1. See *Matter of Walter*, 408 Mass. 584, 588 (1990) (purpose of statute gives "children born out of wedlock the same opportunity as other children to make support and related claims"). The statute maintains the common-law presumption of legitimacy to the extent that it provides that, where a child was born during the marriage or within 300 days after the termination of the marriage, the husband is presumed to be the father of the child and must be joined as a party in any paternity action. G. L. c. 209C, § 6 (*a*). But the statute made it easier to rebut the presumption by reducing the standard of proof to establish paternity to "clear and convincing evidence." G. L. c. 209C, § 7. In 1990, we

---

[7] In *P.B.C.* v. *D.H.*, 396 Mass. 68, 71 (1985), cert. denied, 475 U.S. 1058 (1986), this court extended the scope of the common-law presumption of legitimacy to include a child conceived by a married woman where the child was born after the mother's divorce became final.

revised our common law to conform with c. 209C, declaring that the common-law presumption could be rebutted by clear and convincing evidence of paternity, citing "the gradual betterment of the illegitimate child's legal position, which weakens the purpose behind the presumption, coupled with the corresponding recognition of the interests of unwed putative fathers." *C.C.* v. *A.B.*, *supra* at 686. See *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972) (recognizing father's interest in "children he has sired and raised").

Where, as here, the mother was married at the time of conception or birth, a putative father who is not the husband has only two ways to establish his paternity. First, pursuant to G. L. c. 209C, the mother, husband, and putative father may all agree that the putative father is the biological father of the child. For this agreement legally to be effective, the mother and her spouse must "sign an affidavit denying that the spouse is the father of the child," and the mother and putative father, before a notary, must sign a voluntary acknowledgment of parentage declaring that they are the parents of the child. G. L. c. 209C, § 5 (*b*).[8] Where these documents are properly signed and the acknowledgment of parentage that was executed by the mother and putative father is filed with the court or the registrar of vital records and statistics, the acknowledgment "shall establish paternity as of the date it has been signed . . . and shall have the same force and effect as a judgment of paternity." G. L. c. 209C, § 11 (*a*).[9] However, where the marriage between the mother and her spouse has terminated by the death of either spouse before the husband's affidavit denying paternity is properly executed, paternity

---

[8]The relevant language of G. L. c. 209C, § 5 (*b*), provides:

"If the mother of the child was or is married and the child's birth occurs during the marriage or within 300 days of its termination by divorce, a voluntary acknowledgment of parentage naming the putative father may be executed by the mother and the putative father only if the mother and the person who was the spouse of the mother at the time of the child's birth or conception sign an affidavit denying that the spouse is the father of the child . . . ."

[9]A signatory to the acknowledgment may file a petition in the Probate and Family Court to rescind the acknowledgment within sixty days of its signing or, failing that, may challenge it "within one year only on the basis of fraud, duress or material mistake of fact." G. L. c. 209C, § 11 (*a*).

cannot be established by voluntary acknowledgment because both the mother and the husband must sign an affidavit to make it effective. See G. L. c. 209C, § 5 (*b*). In such a situation, the only way to establish paternity is by filing a complaint and obtaining a final adjudication of paternity. See *id.* ("where the marriage has been terminated by annulment or by the death of either spouse, paternity of the putative father may only be established by filing a complaint to establish paternity as provided in this chapter"). But where the putative father is the party seeking to bring such an action, he cannot do so under G. L. c. 209C. See G. L. c. 209C, § 5 (*a*).[10] Rather, he must file a complaint in the Probate and Family Court under the general equity provisions of G. L. c. 215, § 6. See *C.C.* v. *A.B., supra* at 689.

Here, because the mother was married at the time of Karen's birth and the husband had not executed an affidavit denying his paternity during the mother's lifetime, the voluntary acknowledgment of parentage executed by the mother and R.R. was not effective as a matter of law, and did not have the force or effect of a judgment of paternity. See G. L. c. 209C, §§ 5 (*b*), 11 (*a*). Because it did not have the force or effect of a judgment, the time limitations in § 11 (*a*) to rescind or challenge the acknowledgment did not apply.[11]

---

[10]General Laws c. 209C, § 5 (*a*), states in relevant part:

"[I]f the mother of the child was or is married and the child's birth occurs during the marriage or within three hundred days of its termination by death, annulment or divorce, complaints to establish paternity under this chapter may not be filed by a person presumed to be or alleging himself to be the father unless he is or was the mother's husband at the time of the child's birth or conception."

[11]Because the voluntary acknowledgment of parentage had no legal force or effect, we need not determine whether the judge was correct that there was a "fraud on [the] court." While the judge's findings do not make clear what conduct he deemed to constitute a fraud on the court, we note from the hearing transcript that he appeared to be focused primarily on the mother's apparently false assertion in the voluntary acknowledgment of parentage that she was not married when she gave birth to Karen. There is no evidence in the record to suggest that R.R. himself knew the mother was married when Karen was born; he told the judge that he learned of the marriage two months after Karen's birth. While he learned of her marriage before the mother filed a complaint for support, custody, or visitation (custody action), and did not

As we have explained, because the voluntary acknowledgment of parentage was ineffective as a matter of law, R.R.'s only recourse to establish paternity is to file a new complaint in equity in the Probate and Family Court. See G. L. c. 215, § 6; *C.C.* v. *A.B.*, *supra*. We recognize that, under our existing case law, where the child's mother was married to a different man at the time of the birth of the child, a putative father has standing to bring an equity petition to establish paternity only if he has a substantial relationship with the child, *C.C.* v. *A.B.*, *supra* at 689-691, and alleges that he is the child's biological father. *C.M.* v. *P.R.*, 420 Mass. 220, 223 (1995). We do not consider here whether we should revisit that case law to broaden a putative parent's standing in an equity suit to establish parenthood without alleging a biological relationship to the child. Cf. *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829, cert. denied, 528 U.S. 1005 (1999) (Probate and Family Court's equity power extends to grant visitation rights to "de facto parent . . . who has no biological relation to the child, but has participated in the child's life as a member of the child's family").

Regardless of whether R.R. may prevail in a paternity action, he still has the opportunity to be Karen's parent or guardian if that is determined to be in her best interests. Among his options, as the department noted in its brief, R.R. may work with the department to achieve a child-specific placement that would effectively make him Karen's foster parent. See 110 Code Mass. Regs. §§ 7.103, 7.108 (2009). Or a judge in the Juvenile Court may decide to place Karen in his temporary or permanent custody in the pending care and protection proceeding. G. L. c. 119, §§ 24, 26. Or he may petition to be appointed as the child's guardian with custody. G. L. c. 190B, § 5-201. And finally, if he were to secure custody of Karen and demonstrate his worth as a parent, he could seek to adopt Karen. G. L. c. 210. All of these determinations would be based on the best interests of the child, taking into account the relationship R.R. already has with Karen.

*Conclusion.* The voluntary acknowledgment of parentage

inform the court of the marriage, there is no evidence in the record that R.R. recognized the legal significance of her being married to another man at the time of Karen's birth, or that he was represented by counsel in the custody action before judgment entered.

never became effective as a matter of law, because the mother was married at the time of the child's birth and the husband had not executed an affidavit denying paternity until after the mother's death. Because the acknowledgment never had force or effect, there was no time limit on challenges to its validity, and the judge was required to vacate it.

*Judgment affirmed.*